In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 18-2211 & 18-2232

TYJUAN ANDERSON, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF ROCKFORD, *et al.*,

*Defendants-Appellees*.

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Western Division.
Nos. 3:15-cv-50065 & 3:15-cv-50064 — **Frederick J. Kapala**, *Judge*.

———————————

ARGUED MAY 14, 2019 — DECIDED JULY 25, 2019

———————————

Before FLAUM, KANNE, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Nowhere does the Constitution's promise of due process mean more than in a criminal trial. This promise translates into an obligation when police and prosecutors find themselves in possession of information that exculpates a criminal defendant. That is the cornerstone of the Supreme Court's 1963 decision in *Brady v. Maryland*, and this case presents serious and unresolved questions whether certain detectives in Rockford, Illinois, failed to adhere to their

*Brady* obligations when prosecuting three men for the murder of eight-year-old Demarcus Hanson on April 14, 2002. One of those detectives has since admitted—under oath no less—to engaging in serious misconduct during the investigation.

In 2013 an Illinois court found a *Brady* violation as part of vacating the murder convictions of Tyjuan Anderson, Lumont Johnson, and Anthony Ross after each man served more than a decade in prison. The case entered federal court when Anderson, Johnson, and Ross then brought claims for money damages under 42 U.S.C. § 1983 and state law against the City of Rockford and a score of individual defendants. The district court granted summary judgment on all claims in favor of all defendants. We reverse. While the case entails many complexities, Anderson, Johnson, and Ross have brought forth sufficient evidence to move forward against particular defendants on particular aspects of their alleged due process violations.

## I

Demarcus Hanson was killed by shots fired into his grandmother's Rockford home. The State successfully prosecuted Tyjuan Anderson, Lumont Johnson, and Anthony Ross for the murder and each received a 50-year sentence. The men spent more than a decade in prison before an Illinois court ordered a new trial based on the delayed disclosure of *Brady* material—specifically, the recorded jail calls of the prosecution's key witness in which he contradicted his trial testimony. Anderson, Johnson, and Ross were retried and acquitted. They then turned to federal court by filing this lawsuit against the City of Rockford and multiple Rockford police officers alleging that the defendant officers violated their rights under the U.S. Constitution and Illinois law by not only withholding the recorded jail calls and other exculpatory information, but also

by fabricating evidence leading to their convictions for a crime they insist they did not commit.

### A. The Murder and Investigation

At approximately 2:51 a.m. on April 14, 2002, someone fired shots into Estelle Dowthard's home. One of the bullets struck and killed her eight-year-old grandson Demarcus Hanson as he was sleeping in his bed. Responding officers from the Rockford Police Department soon learned that Estelle's son, Alex Dowthard, was likely the shooter's intended target. Dowthard would come to play a substantial role in the investigation and, ultimately, the plaintiffs' trials and convictions.

Detectives Doug Palmer and Joseph Stevens—both defendants in this case—led the investigation. Within hours of the shooting, Palmer and another detective, defendant James Randall, interviewed Dowthard, who denied any knowledge about his nephew's murder. Dowthard told the detectives that, in the hours before the murder, he had a verbal altercation with Anderson, Johnson, and Ross near the M+M Market in Rockford and he shot at the trio as they drove in a white Suburban. Dowthard explained that he then drove to his mother's home and hid his gun under a car parked outside. He insisted, however, that he was not present when shots were later fired at his mother's house and therefore did not know who killed his nephew.

The police used Dowthard's admission that he possessed a gun (and shot at the plaintiffs) to detain him on a parole violation. A few weeks later, on May 2, Detectives Palmer and Stevens again sought to speak with Dowthard, this time at Big Muddy River Correctional Center, where he was incarcerated on the parole violation. And Dowthard again denied any

knowledge about his nephew's murder. During this visit, Detective Stevens also requested copies of Dowthard's jail calls to assist with the investigation. Less than two weeks later, undoubtedly to increase the pressure on Dowthard to cooperate, the State resurrected an old set of forgery allegations (dating to February 2002) that had gone uncharged. The new charges provided a second basis to revoke Dowthard's parole.

Rockford police met with Dowthard a third time on May 31, 2002. This time Dowthard, who was still incarcerated for the parole violation, agreed to talk, but only if detectives agreed to inform the parole board of his cooperation. He then provided Sergeant Gregory Lindmark and defendant Detective Theo Glover a written statement claiming, for the first time, that he was present when his nephew was shot. Despite his initial denials, Dowthard now claimed he saw three individuals—Anderson, Johnson, and Ross—exit a red car with guns and then, as he was fleeing, heard shots fired toward his mother's house. He told the police that he initially denied seeing the shooters because he thought he could handle the matter himself. Later that summer, Dowthard repeated this story before the grand jury, and on July 31, the State dismissed his forgery charge.

Detectives Stevens and Palmer also interviewed Lataurean Brown, who was with Dowthard in the hours before the murder. While Brown would eventually become an important prosecution witness, during his initial interview on April 24, he denied knowing who shot at the Dowthard home. But he admitted to seeing Alex Dowthard fire shots at the plaintiffs' Suburban earlier that night. He also told police that he drove Dowthard to his mother's house, where Dowthard hid his gun under a car. The two men then drove to the Concord

Commons, where Brown saw and spoke to his cousin Rickedda Young. A few weeks later, Detectives Stevens and Palmer interviewed Brown a second time. By the end of the ten-hour interview, Brown changed his account and signed a written statement claiming Anderson, Johnson, and Ross were responsible for Hanson's death.

In April 2002, and following up on the information provided by Brown, the police spoke with Rickedda Young. Young told Detectives Stevens and Scott Mastroinanni (also a defendant in this case) that she saw and spoke to Brown and Dowthard at the Concord Commons during the early morning hours of April 14. She stated that Dowthard and Brown told her that someone had just fired shots at them as they fled Dowthard's mother's house, but they did not know who. Neither Stevens nor Mastroinanni documented or disclosed this fact—that immediately after the shooting, the State's key witnesses told a family member they did not see the shooter—in the subsequent prosecution of Anderson, Johnson, and Ross.

The Rockford police also investigated but ultimately excluded two other possible suspects, Kefentse Taylor and Casel Montgomery, before arresting the three plaintiffs (Anderson, Johnson, and Ross) for Demarcus Hanson's murder.

### B. Criminal Trials

Anderson and Johnson proceeded to trial in October 2002. The Thursday before trial was to begin, the prosecution received more than 40 hours of Alex Dowthard's recorded jail calls from the Rockford police. The tapes, which were made available to the plaintiffs' then-defense attorneys the following afternoon, included Dowthard's conversations with fam-

ily and friends while he was incarcerated for the parole viola-
tion in May 2002. The conversations predated Dowthard's
May 31 written statement in which he first implicated the
plaintiffs. Given the length and poor quality of the recordings,
the attorneys for the plaintiffs (then defendants) requested a
continuance for more time to listen to all of them and to de-
termine whether they contained exculpatory or otherwise
useful defense evidence. The trial court denied the request
and proceeded with jury selection, affording the attorneys for
Anderson and Johnson only a couple of days to review the
recordings.

With no physical or forensic evidence connecting the
plaintiffs to the crime, the prosecution's case rested on the tes-
timony of Alex Dowthard and Lautaurean Brown. Dowthard
testified consistent with his May 31 written statement impli-
cating the plaintiffs, though he offered a different explanation
for his evolving account of the murder. Recall that in his writ-
ten statement Dowthard claimed that he initially lied to the
police (by denying knowledge of who shot Hanson) because
he thought he could handle the situation himself. At trial,
however, Dowthard testified that during his first two inter-
views he told detectives he did not witness the murder be-
cause he was on parole and telling the police the true and full
account of what happened during the early morning hours of
April 14 would mean admitting that he had a gun and thus
admitting to a parole violation. (This explanation made little
sense because Dowthard admitted to possessing a gun during
his first interview with police just hours after the murder,
which resulted in a parole violation.)

Dowthard further testified that he eventually cooperated
with police without receiving anything in return. During

cross-examination, however, he conceded that following his testimony in the grand jury, the State dropped his unrelated forgery charge, sent a letter to the parole board relaying this information, and decided not to charge him for the shots he fired at the plaintiffs just before Hanson's murder. Neither party introduced or otherwise used any aspect of Dowthard's jail calls at Anderson and Johnson's trial.

Lautaurean Brown also testified for the prosecution and, like Dowthard, pointed the finger at the plaintiffs, though he denied seeing anyone carrying a gun.

As for the defense case, Anderson and Johnson presented alibi witnesses and argued that two other individuals, Kefentse Taylor and Casel Montgomery, were the actual shooters. The jury found Anderson and Johnson guilty of murder, and the trial court later sentenced each of them to 50 years' imprisonment.

The third plaintiff, Anthony Ross, proceeded to trial in 2004. Brown and Dowthard again testified for the prosecution and echoed the accounts provided in the trial of Johnson and Anderson. The jury also heard from Ross's cousin, Sonya White, who claimed she was with Ross when he tossed the murder weapon into a lake and confessed to killing Hanson. Ross then testified in his own defense and denied any involvement in the murder while also presenting an alibi witness. The jury returned a guilty verdict, and, as with Johnson and Anderson, Ross received a sentence of 50 years.

### C. Post-conviction Proceedings

Following unsuccessful direct appeals, all three plaintiffs filed petitions for post-conviction relief in which they asserted their innocence and alleged, as they do here, that the officers

investigating Demarcus Hanson's murder committed numerous *Brady* violations. They also alleged that the defendant officers engaged in misconduct by coercing witnesses and fabricating evidence. In support of their claim, the plaintiffs submitted an affidavit by Detective Palmer—the lead investigator—in which Palmer admitted that he threatened witnesses, falsified witness statements, neutralized exculpatory evidence, and instructed witnesses to offer testimony he believed was false.

The trial court reacted to Detective Palmer's admissions of misconduct by holding an evidentiary hearing on the plaintiffs' petitions for post-conviction relief. The court heard testimony from Palmer and approximately 34 other witnesses. Palmer's testimony focused on three topics: the circumstances surrounding his resignation from the Rockford Police Department in 2004, his own wrongdoing during the Hanson murder investigation, and his belief that Anderson, Johnson, and Ross did not commit the murder. We need focus only on the testimony regarding police misconduct.

Palmer admitted at length and in substantial detail that he threatened and coerced witnesses to give statements and encouraged witnesses to provide false testimony during the plaintiffs' criminal trials. He described, for example, how he had instructed the two key prosecution witnesses—Dowthard and Brown—to testify consistently with their written statements implicating the plaintiffs even though he believed those statements were false. He also explained how he falsified a statement from a man named Bryce Croft and then compelled Croft to sign the statement.

The details matter. According to Palmer, in the summer of 2002 and before the plaintiffs' trials, Bryce Croft, then an inmate at Winnebago County Jail, requested to see him and, during the meeting that followed, provided detailed information implicating an alternative suspect, Casel Montgomery, in Hanson's murder. Palmer testified that instead of pursuing this lead against Montgomery, he took a deliberate step to prevent Croft's statement from being of any use to the plaintiffs during their criminal trials. He told the court that he did so at the direction of his supervisor, testifying that "Sergeant Lindmark told me to make a liar out of Bryce Croft." Palmer explained that, upon receiving this instruction, he met a second time with Croft and, during that meeting, forced Croft to sign a pre-written and false statement recanting his original statement. The plaintiffs went to trial knowing none of the circumstances surrounding Croft's second statement or that his recantation was false.

Croft, too, testified at the evidentiary hearing and corroborated much of Detective Palmer's account. He explained that he met with Palmer in July 2002 to provide information about Casel Montgomery's role in the murder. After doing so, though, Palmer returned a few months later and, as Croft recounted, threatened him with perjury charges if he did not recant his original statement implicating Montgomery. Croft recalled that Palmer brought with him a pre-written statement and, as part of leveling a threat of prosecution, demanded Croft sign it. Croft explained that he signed the second statement—even though he knew it was false—because of Palmer's threats.

The plaintiffs also called Alex Dowthard as a witness, but he asserted his Fifth Amendment privilege against self-incrimination and did not testify.

As part of assessing the plaintiffs' *Brady* claims, the trial court also considered statements Dowthard made during telephone calls from jail in May 2002. It was undisputed that these recorded conversations, which totaled approximately 40 hours, were not made available to the attorneys for Anderson, Johnson, and Ross until Friday, October 18, and Anderson and Johnson's joint trial was to begin the following Monday, October 21.

Contrary to his testimony at the plaintiffs' criminal trials, during several conversations with family, Dowthard denied being present when his nephew was shot and killed. These conversations took place shortly after Dowthard's incarceration for the parole violation and, importantly, at the time the police were visiting him and pressing for information on the Hanson murder. On May 2, for example, the same day Detectives Palmer and Stevens visited Dowthard at Big Muddy, Dowthard told his mother that "he told them the truth," a clear reference to telling the police that he did not know who shot the young boy. And again, on May 11, Dowthard told his cousin Antowan Lambert that, at the time of the murder, he "wasn't no mother f* * * ing where around, you know what I'm saying."

The jail calls further revealed that Lambert, who officers were also pressing for information about Hanson's murder, coached Dowthard on what to tell the police about the murder and fed him information about what Lautaurean Brown had told the police—all in an effort to enable Dowthard to align his account with Brown's. For example, on May 16, two

weeks before Dowthard gave police a statement incriminating the plaintiffs, Lambert told Dowthard to memorize what he was telling him so that Dowthard's statement "w[ould] coincide" with what Brown had already told police.

In other calls from jail, Dowthard told friends and family that the police were pressuring him to cooperate. In early May, for instance, he told his mother that "[the police] talkin' about bringin' me up on some federal charges or whatever." On May 13, Dowthard learned he was being charged with an unrelated forgery that would impact his parole status. On May 20, Dowthard told someone named Maria that the police were "playin' with me, hurtin' me until I'm damn near at the point man, you just don't know." In this same call, Dowthard added "[Detective] Palmer man got—hittin' me all upside my head and everything, man tellin' my sister what to—put his hands on me."

Following the hearing, the court rejected any claims of police misconduct, emphasizing that it did not find Detective Palmer's testimony credible. While recognizing the extraordinary nature of Palmer's admissions, the court concluded that "through his words, actions and timing of his 'disclosures,'" the former detective had "cast a pall over the credibility of his latter day revelations." Our review of the record suggests that the court's credibility finding may have been driven in large part by the circumstances surrounding Palmer's resignation from the Rockford Police Department. Those circumstances are not relevant here.

Turning to the plaintiffs' arguments regarding Dowthard's jail calls, the court awarded each plaintiff a new trial, concluding that the State impermissibly delayed disclosure of the recordings. The calls, the court explained, included

"outright denials of knowledge about the facts of the case" as
well as "potential coaching" and "potential incentive" to im-
plicate the plaintiffs—and without timely access to the record-
ings, the plaintiffs were "denied an essential tool in testing the
credibility of Alex Dowthard." The delayed disclosure was
particularly concerning, the court emphasized, because this
was "essentially a one-eyewitness case," and the key im-
peachment material was turned over "on the virtual eve of
trial," making it impossible for the attorneys to "meaningfully
listen to [the tapes] and evaluate them." Due process de-
manded a new trial, the court concluded, because it could not
be sufficiently assured that the outcome of the trial would
have been the same had Dowthard been cross-examined with
his statements on the tapes.

The State unsuccessfully appealed the trial court's award
of post-conviction relief. See *People v. Johnson*, 2014 IL App
(2d) 130368-U. The Illinois appellate court did not upset the
trial court's finding that Anderson and Johnson established
a *Brady* violation. But the court reached a different conclusion
as to Ross. Because Ross's trial took place in 2004—more than
a year after the prosecution turned over the Dowthard
tapes—the court determined that he was not prejudiced by
the delayed disclosure of the recordings. Instead, the court af-
firmed the grant of post-conviction relief as to Ross on alter-
native grounds, holding that Ross's counsel was ineffective
for failing to impeach Dowthard with the statements from his
recorded jail calls.

### D. Criminal Retrial

In 2015 the defendants were retried for the Hanson mur-
der in a bench trial. This time Alex Dowthard invoked his

Fifth Amendment privilege against self-incrimination and re-
fused to testify. Lautaurean Brown initially did the same but
then ultimately took the stand and stated that he "couldn't see
[the shooting] 'cause I pulled off." Finally, Sonya White, who
testified at Ross's original trial that Ross confessed to the mur-
der, recanted her prior testimony and stated that she did not
know who was responsible for Hanson's death.

The court acquitted all three men of murder.

### E. Civil Litigation

In March 2015 the plaintiffs filed this lawsuit, raising
many of the same issues that formed the basis of their state
post-conviction petitions. In two separate complaints, the
plaintiffs asserted nine claims against the City of Rockford
and multiple Rockford police officers pursuant to 42 U.S.C.
§ 1983: violation of their due process right to a fair trial under
the Fourteenth Amendment, conspiracy to deprive them of a
right to a fair trial, failure to intervene, supervisory liability,
and malicious prosecution. Each claim alleged that the de-
fendant officers engaged in gross misconduct while investi-
gating Demarcus Hanson's murder. The plaintiffs further al-
leged that the officers' misconduct was undertaken pursuant
to a policy and practice of the Rockford Police Department.
They also advanced four separate claims under Illinois law:
malicious prosecution, intentional infliction of emotional dis-
tress, respondeat superior, and indemnification based on the
same underlying conduct as alleged in their federal claims.

The case proceeded to discovery. What is most relevant for
purposes of appeal is that during the depositions of Detective
Palmer and Alex Dowthard, both individuals invoked their

protection under the Fifth Amendment and declined to testify.

The district court entered summary judgment for all defendants on all claims. Beginning with the plaintiffs' § 1983 due process claim, the court concluded the plaintiffs failed to identify sufficient evidence to demonstrate that any of the defendant police officers committed any of the alleged *Brady* violations or instances of evidence fabrication. Because each of the remaining claims allege the same underlying conduct, this conclusion led directly to the entry of summary judgment in the defendants' favor on every other claim.

The plaintiffs now appeal.

## II

We begin with the plaintiffs' contention that the defendant police officers deprived them of a fair trial in violation of their rights under the Fourteenth Amendment's Due Process Clause. The plaintiffs root their claim in two different theories: the defendant officers both withheld exculpatory evidence in violation of their *Brady* obligations and fabricated false witness statements. While we agree that summary judgment was proper on the fabrication allegations (with one limited exception), we conclude that the plaintiffs presented enough evidence to move forward on four particular grounds supporting their due process claim based on alleged *Brady* violations.

### A.  Due Process Claim: *Brady* Violations

The district court concluded that the record showed no genuine dispute as to whether the defendant police officers suppressed exculpatory evidence. In reaching this conclusion, however, the court failed to view the evidence in the light

most favorable to the plaintiffs and adhere to the fundamental principle that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The teachings of *Brady* are clear. In *Brady* itself the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused…violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Subsequent decisions make plain that this precept translates into an affirmative duty to disclose to defendants all potentially exculpatory evidence, including impeachment evidence. See *United States v. Bagley*, 473 U.S. 667, 676 (1985). Because *Brady* material also "encompasses evidence 'known only to police investigators and not to the prosecutor,'" prosecutors have an affirmative duty "to learn of any favorable evidence known to the others acting on the government's behalf in [a] case, including the police." *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995)). This "*Brady* rule," the Court has explained, is not intended "to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *Bagley*, 473 U.S. at 675.

"While most commonly viewed as a prosecutor's duty to disclose to the defense," it is settled that the duty imposed by *Brady* "extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor." *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008);

see also *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 349 (7th Cir. 2019).

To prevail on a civil *Brady*-based due process claim against a police officer, a plaintiff must demonstrate that the evidence in question was favorable to him, the police "suppressed" the favorable evidence, and prejudice ensued because the suppressed evidence was material. See *Carvajal*, 542 F.3d at 566–67; see also *Cairel v. Alderden*, 821 F.3d 823, 832 & n.2 (7th Cir. 2016). Evidence is suppressed for *Brady* purposes if the "prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence" and "the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001).

To satisfy *Brady*'s prejudice prong, a civil plaintiff must demonstrate that the withheld evidence was material, meaning "there is a 'reasonable probability' that the result would have been different had the suppressed evidence been put before the jury." *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019) (quoting *Kyles*, 514 U.S. at 422). The Supreme Court has made clear that *Brady*'s "reasonable probability" standard is less onerous than the traditional preponderance standard. See *Kyles*, 514 U.S. at 434. Indeed, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* To make this determination, courts must assess the cumulative effect of all the suppressed evidence "in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976); see also *Kyles*, 514 U.S. at 460.

Turning to the merits, the plaintiffs argue that the defend-ant officers failed to adhere to *Brady*'s mandate—and violated their due process rights—by:

- Failing to disclose impeachment evidence of-fered by Rickedda Young;

- Failing to disclose the circumstances surround-ing Bryce Croft's second statement;

- Failing to disclose the improper police tactics that produced Lautaurean Brown's May 9, 2002 statement;

- Failing to disclose the improper police tactics that produced Alex Dowthard's May 31, 2002 statement and, relatedly, failing to timely dis-close Dowthard's jail calls; and

- Failing to disclose the circumstances surround-ing Sonya White's statement implicating Ross in the murder.

With the exception of the allegations involving Sonya White, which lack support in the record, and the allegations involving the improper police tactics used on Dowthard, which lack admissible evidence in the record, we conclude that the plaintiffs have come forward with enough evidence to move forward with each of their alleged *Brady* violations against particular defendants.

**Rickedda Young Testimony.** The plaintiffs contend that two of the defendants, Detectives Joseph Stevens and Scott Mastroianni, committed a *Brady* violation by failing to dis-close that Rickedda Young informed them that she saw Brown and Dowthard immediately following the murder and they

told her they did not see who shot at Dowthard's mother's house and killed Hanson. For purposes of summary judgment, the defendants do not dispute that this evidence was favorable to the plaintiffs and that Stevens and Mastroianni suppressed it by not including it in their police reports or otherwise disclosing it to the prosecutors or plaintiffs. The defendants nonetheless urge us to view the evidence as falling short of *Brady*'s materiality threshold. Because the evidence allows a contrary inference, we decline this invitation.

As the district court saw it, Young's statement was immaterial—and therefore its omission did not prejudice the plaintiffs—because "it merely echoed the fact that [Alex] Dowthard and [Lautaurean] Brown had initially indicated that they did not know who [fired] shot[s] [at] Dowthard's mother's house." The district court, in short, saw Young's statement as cumulative of information the jury heard and knew.

But this perspective reflects too narrow a view of the evidence, divorced from favorable and indeed exculpatory inferences available to the plaintiffs on these facts. The district court correctly observed that the jurors learned that both Brown and Dowthard initially told police they did not see the shooters—in direct contradiction to their ultimate trial testimony. What the court did not account for, though, was the testimony explaining these inconsistencies. Dowthard, for example, testified that he told police he did not know who killed his nephew because he was on parole and was not supposed to have a gun. Young's statement—that immediately after the shooting, Brown and Dowthard told her, a family member, that they did not know who had just shot at them—would have directly impeached Dowthard's explanation for why his

story changed. And the impeachment was on a point of substantial significance. Had the trial testimony included Young's statement, the jury could have concluded that Dowthard in fact did not see who fired the shots into his mother's house. Put differently, the jury could have concluded that Dowthard's and Brown's statements to Young immediately following the murder were true—that, in fact, they did not know who shot into Dowthard's mother's house—and that their trial testimony (and Dowthard's explanation of his original statement to police) was false.

Suppressed impeachment evidence "may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith v. Cain*, 565 U.S. 73, 76 (2012). But suppressed evidence takes on particular significance—and is "plainly material"—where the prosecution's case rests solely on the credibility of an eyewitness. *Id*.

That is the case here. No physical or forensic evidence linked the plaintiffs to the Hanson murder. Rather, the State's case hinged on the reliability of what the prosecution insisted was eyewitness testimony from Brown and Dowthard. Rickedda Young's suppressed evidence would have directly impeached Brown and Dowthard's testimony that they saw the plaintiffs commit the murder—the central issue at trial. Young's statement also would have lent credibility to the plaintiffs' argument that Dowthard, the State's key witness, initially told the police the truth (that he did not see the shooting) but later lied during his trial testimony to garner personal favor with the State. Based on these inferences, reasonably available from the record, the plaintiffs came forward with enough evidence to survive summary judgement on their the-

ory that the defendant officers (in particular, Detectives Stevens and Mastroianni) violated *Brady* by withholding Young's statement. The district court erred in concluding otherwise.

**Bryce Croft Evidence.** What the record shows regarding Bryce Croft is most troubling. In the summer of 2002—before the plaintiffs' criminal trials—Croft provided Detective Palmer with firsthand information that someone other than the plaintiffs committed the murder. This development, Palmer has admitted, later led him to prepare a false statement on behalf of Bryce Croft, which he then forced Croft to sign. The statement was significant because it recanted the information Croft previously provided police about the alternative suspect (Casel Montgomery). Palmer did so—he has stated under oath—not only knowing the statement was false, but also for the sole purpose of neutralizing a witness who had a meaningful chance of undermining the prosecution's case against the plaintiffs.

The district court accepted that the plaintiffs knew nothing of Detective Palmer's misconduct before their criminal trials or that Croft's recantation was false. But it nonetheless concluded that "the concealment of the coercion and fabrication of Croft's second statement did not prevent plaintiffs from calling him as a witness at their trials" because "[e]ither side could have called Croft and allowed the adversarial trial process to flesh out the truth."

This conclusion too discounts the evidence, especially at summary judgment. Nothing we see in the record shows that, at the time of their criminal trials, the plaintiffs had any idea that Croft's recantation was the product of police coercion or fabrication. And, without Detective Palmer's admission, the plaintiffs had no way to *prove* the recantation was false.

Due process entitled the plaintiffs to learn before their trial what went on with Bryce Croft. See *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017) (explaining that the right to a fair trial is implicated if the State fails to disclose "facts about the coercive tactics used to obtain" a witness's statement). Remember that Croft was not a fringe player for the plaintiffs' defense. To the contrary, he was a witness the plaintiffs very well may have called to assign responsibility for the Hanson murder to someone else. Croft had given an initial statement to the police saying that he had firsthand knowledge that Casel Montgomery—not the plaintiffs—was responsible for the murder. But there was no way the plaintiffs would have run the risk of calling Croft as a witness at their criminal trials in the wake of his statement recanting that Montgomery was responsible for the murder. And that simple observation—as Detective Palmer has since admitted—is precisely why he falsified the recantation and then forced Croft to sign it. The whole point was to neutralize Croft without the plaintiffs ever knowing that Croft's about-face was the fruit of police misconduct. The plaintiffs have brought forth plenty here to move forward on this alleged *Brady* violation.

**Lautaurean Brown's Statement.** We next consider the plaintiffs' contention that Detectives Palmer and Stevens violated *Brady* by failing to disclose the coercive tactics used to extract Lautaurean Brown's statement implicating them in Hanson's murder. The district court accepted that, when viewed in the light most favorable to the plaintiffs, the evidence showed that Brown's May 9, 2002 statement (and his corresponding trial testimony) implicating the plaintiffs was the product of Palmer's threat that he would go to jail if he did not give a written statement incriminating the plaintiffs. But from there the court concluded that the plaintiffs failed to

identify adequate evidence to satisfy *Brady*'s prejudice element because, during the plaintiffs' retrial in 2015, Brown testified that the threat did not impact the accuracy of his statement. We cannot agree.

The district court's reasoning effectively required the plaintiffs to accept that Brown's testimony in 2002 and 2004 was true because he later said so. The proper *Brady* analysis works a different way. Regardless of whether Brown's statement (and resulting testimony) was true or false, *Brady* imposed a disclosure obligation: due process required disclosure to the plaintiffs of the coercive tactics used to obtain Brown's statement. See *Avery*, 847 F.3d at 439. Armed with that information, the plaintiffs could have contended, in their cross examinations of Brown and during closing arguments, that Brown's testimony implicating the plaintiffs in the Hanson murder was false—the fruit of police coercion. Put most simply, a criminal defendant has a due process right to information that may materially impeach the testimony of a state's witness. Indeed, that is the very promise—the essential protection—of *Brady.* Because it is undisputed that the defendants failed to disclose the coercive tactics used to obtain Brown's statement, the district court erred by granting summary judgment on this alleged *Brady* violation.

**Alex Dowthard's Jail Calls.** Finally, the district court compounded these errors by rejecting the plaintiffs' contention that an interrelated *Brady* violation occurred with the delayed disclosure of the recordings of Alex Dowthard's telephone calls from Big Muddy River Correctional Center. Recall that the tapes contain 40 hours of conversations Dowthard had with his family and friends in May 2002, following his incarceration on a parole violation. In the recorded conversations,

Dowthard told his family and friends that he was not present when his nephew was shot; he was threatened with additional charges if he failed to cooperate; he was physically threatened by police; and he was coached on what to say to police. Without question this evidence is both favorable and material to the plaintiffs. The only issue, then, is whether the tapes were suppressed within the meaning of *Brady.* The plaintiffs have come forward with enough at summary judgment showing the answer may well be yes.

To establish that the tapes were suppressed, the plaintiffs must show that the State "failed to disclose known evidence before it was too late for [them] to make use of the evidence" at their criminal trials. *Collier v. Davis*, 301 F.3d 843, 850 (7th Cir. 2002). "The relevant inquiry," we have emphasized, "is not whether the [State] disclosed the potentially exculpatory information *at all,* but whether [the criminal defendant] had sufficient time to use any exculpatory information revealed to him during trial." *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014).

The record shows that the prosecution received the Dowthard recordings from Rockford police on October 17, 2002—the Thursday before Anderson and Johnson's trial. The State produced the tapes to the plaintiffs' (then defendants') attorneys the next day, a period that two Illinois courts concluded was insufficient to allow for meaningful review and use of the tapes at trial. The plaintiffs contend, however, that Detective Stevens—not the prosecutors—suppressed the tapes by willfully withholding them from the prosecution until the eve of trial.

In most circumstances "a police officer's *Brady* obligations are discharged by disclosing material exculpatory evidence to

the prosecutor, [because] it is the prosecutor's responsibility to turn the evidence over to defense counsel." *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015). Here, though, the facts as they presently stand permit a different conclusion. The record shows that Detective Stevens requested Dowthard's jail calls on May 2, 2002. He testified that the jail sent him the recorded calls piecemeal on 20 different tapes, and he then listened to each of them. Though we are unable to discern with precision when Stevens actually received or listened to each of the tapes, there are indications in the record that he received them in May and June. In a supplemental police report dated September 9, 2002, for example, Stevens described his work on the Hanson case in May 2002, noting that "[w]hile Dowthard was in prison, [Stevens] received packages of cassette tapes which had recorded phone calls Alex Dowthard made while incarcerated at Big Muddy River Correctional Center." Dowthard testified that he was released from custody at the end of June 2002, permitting the inference that Detective Stevens possessed the jail tapes for at least three months before Anderson and Johnson's criminal trial yet waited to disclose them until the Thursday before trial, while also assuring the lead prosecutor that the calls contained nothing relevant to the Hanson case.

When we view the evidence in the light most favorable to the plaintiffs—as we must on summary judgment—the record allows the inference that, after receiving the tapes in May and June 2002, Detective Stevens withheld the calls, waited until the eve of trial to turn them over (when it was already too late for the plaintiffs to use them), and may well have compounded the delay by inaccurately describing their content and significance when he eventually turned them over to the prosecution. On this record, we conclude that there is enough

here to infer that Stevens suppressed the Dowthard tapes within the meaning of *Brady*. Of course, the ultimate facts may come out differently at trial and fully absolve Detective Stevens. Our conclusion is limited to observing that the record, as it now stands, allows the plaintiffs to survive summary judgment on this alleged *Brady* violation.

For the sake of completeness, we briefly address an evidentiary matter the parties have raised with respect to the Dowthard tapes. The parties devote considerable attention to the admissibility of the recordings. The district court concluded that Dowthard's calls could not be used as evidence in opposition to summary judgment because they contain inadmissible hearsay. See *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment."). To the extent that the plaintiffs seek to admit Dowthard's statements on the calls for their truth, we agree.

But observing that the statements made on the recorded calls may not be admissible for their truth under one or another exception to the hearsay rule does not mean the evidence is not relevant and admissible for another purpose. The alternative purpose here is to establish the existence of a *Brady* violation based on Detectives Stevens's failure to disclose the impeachment material contained on the tapes. To succeed on this aspect of their due process claim, Anderson and Johnson must show not that Dowthard was telling the truth during his phone conversations with family and friends, but rather that the plaintiffs could have used his statements for impeachment purposes during their criminal trial—to undermine the credibility of testimony offered by Dowthard. See 28 Wright & Gold, Federal Practice and Procedure § 6206 at 593 (2012)

("Where a prior inconsistent statement is offered only to im-
peach, it is not hearsay since it merely shows the witness is
unreliable and says nothing about the truth of the facts as-
serted in the statement.").

To the extent that the parties debate the authenticity of the
Dowthard tapes, we note only that, as best we can tell, no one
questions whether the tapes came from the State and reflect
Dowthard's voice and telephone discussions while incarcer-
ated at Big Muddy. And what we see in the summary judg-
ment record are certified transcripts of the recorded calls (just
as a deposition transcript would be certified), and there too
nobody seems to say the certification is false. We have no rea-
son, in short, to question that the plaintiffs have sufficiently
authenticated the tapes and transcripts to allow us to consider
their impeachment value for purposes of assessing this aspect
of their *Brady* claim.

### B.  Due Process Claim: Fabricated Evidence

In their amended complaint, the plaintiffs also alleged that
the officers fabricated a laundry list of evidence. Those allega-
tions extend to Alex Dowthard's and Lautaurean Brown's
statements (and subsequent trial testimony) implicating the
plaintiffs in Hanson's murder as well as Bryce Croft's recan-
tation. While we agree that the plaintiffs brought forward ev-
idence of coercion, we see no error with the district court dis-
allowing the due process claim to go forward on a theory of
fabricated evidence with one limited exception as it pertains
to Detective Palmer.

It is well-established that "a police officer who manufac-
tures false evidence against a criminal defendant violates due
process if that evidence is later used to deprive the defendant

of [his] liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). To establish such a violation, the plaintiffs must demonstrate not only that the defendant officers "created evidence that they knew to be false," *Petty*, 754 F.3d at 423, but also that the evidence was used "in some way" to deprive them of liberty, *Whitlock*, 682 F.3d at 580.

The plaintiffs' primary contention is that the defendant officers coerced the prosecution's two key witnesses, Dowthard and Brown, to give statements implicating the plaintiffs that the defendants knew were false, with the statements then being used to convict the plaintiffs of the Hanson murder. Beginning with Brown, the plaintiffs assert that Detectives Palmer and Stevens secured a false statement blaming Anderson, Johnson, and Ross for Hanson's murder by threatening Brown with jail time if he failed to cooperate and detaining him for more than ten hours. They also contend that Palmer and Stevens, along with Detective Theo Glover, coerced Dowthard into falsely implicating the plaintiffs, this time through physical force and by threatening him with additional charges if he failed to cooperate. And, with respective to both Dowthard and Brown, the plaintiffs maintain that Detective Palmer instructed both witnesses to testify consistently with their statements, even though he knew those statements were false.

As a threshold matter, we agree that the record shows a genuine and unresolved dispute about whether the police coerced Brown and Dowthard to provide statements blaming the plaintiffs for Hanson's murder. But coercion and fabrication are not synonyms, and we have stressed that "[an allegation] that an officer coerced a witness to give incriminating evidence does not, at least standing alone, violate the wrongly

convicted person's due-process rights." *Avery*, 847 F.3d at 439. Even more specifically, we have drawn a line between coerced testimony—"testimony that a witness is forced by improper means to give… [it] may be true or false"—and fabricated testimony—which is "invariably false." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). Only the latter supports a due process claim, and even then, only if the record shows that the officers "created evidence they *knew to be false*." *Avery*, 847 F.3d at 439; see also *Whitlock*, 682 F.3d at 584 (explaining that "[c]oercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial" because "[e]vidence collected with these kinds of suspect techniques, unlike falsified evidence and perjured testimony, may turn out to be true").

The plaintiffs have not brought forth enough evidence to create a genuine material dispute as to whether Detectives Stevens or Glover knew that Brown and Dowthard's statements implicating the plaintiffs were false as required to maintain a due process claim premised on a theory of evidence fabrication. But we reach a different conclusion with respect to Detective Palmer.

The plaintiffs insist that the record shows more than mere coercion because Detective Palmer admitted that he knew that Brown and Dowthard's statements were false and nonetheless instructed them to testify consistent with these false statements at the plaintiffs' criminal trials. See *Fields*, 740 F.3d at 1112 (explaining that investigators fabricated evidence when

they "told witnesses what to say knowing that what the [witness] was telling them was false"). Indeed during the state post-conviction proceedings, Palmer repeatedly shared his belief that Anderson, Johnson, and Ross did not shoot Demarcus Hanson—and that Dowthard's claim that he witnessed the plaintiffs shoot at his mother's house was not true. And, perhaps most critical to our analysis, Palmer testified that, despite this belief, he instructed Dowthard and Brown to testify consistent with their written statements implicating the plaintiffs. Against the backdrop of Palmer's admissions of wrongdoing—not an everyday occurrence—it is very difficult to conclude that the plaintiffs have not done enough to survive summary judgment on this dimension of their due process claim.

This conclusion finds additional support in the record. When deposed in this matter, for example, Detective Palmer exercised his Fifth Amendment right against self-incrimination when asked whether he told Brown and Dowthard to testify consistent with their statements "even though [he] believe[d] their statements [were] not truthful." The Fifth Amendment permits an adverse inference against parties in civil actions when they refuse to testify in response to probative evidence against them. See *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Based on the record before us, and upon combining the weight of Palmer's admissions during the state post-conviction proceedings with this adverse factual inference, we conclude that the plaintiffs have carried their summary judgment burden on their allegation that Detective Palmer fabricated Brown and Dowthard's statements. Palmer did so by coercing the witnesses to give statements he believed were false—and this evidence was used to deprive the plaintiffs of their liberty when Palmer then instructed Brown

and Dowthard to testify consistent with these allegedly false statements.

We turn next to the allegations involving Bryce Croft. Again, the plaintiffs maintain that Detective Palmer drafted a statement for Croft to sign which falsely recanted the information he previously provided about Casel Montgomery's involvement in the murder. Palmer's actions, the plaintiffs contend, prohibited them from presenting evidence of an alternate suspect through Croft because, if called as a witness, he would have been impeached by his false recantation. While this description of events finds support in the record, the plaintiffs cannot show that the prosecution used Croft's second statement (the one prepared by Palmer) to convict any of the plaintiffs. Summary judgment, therefore, was appropriate as it pertains to the plaintiffs' evidence fabrication theory.

## III

The plaintiffs' amended complaints are expansive—naming nine defendants and advancing nine separate claims. On appeal, their arguments are equally sprawling, advancing numerous claims against numerous parties and raising multiple legal issues. Based upon our thorough review of the record and the parties' briefs, we have focused only on those issues we believe warrant discussion and on those aspects of the plaintiffs' claims that survive summary judgment. We have done so in part to aid and sharpen the focus of the proceedings as the case returns to the district court.

In furtherance of this effort, we conclude by recapping which of the plaintiffs' claims (or aspects of claims) may proceed against which defendants on remand.

Beginning with Count I, we affirm the entry of summary judgment for the defendants on the plaintiffs' evidence fabrication allegations with respect to all defendants except Detective Doug Palmer, and only then as it pertains to the testimony of Brown and Dowthard. On this same count, the plaintiffs may proceed with a due process claim rooted in each of following alleged *Brady* violations:

- Failure to disclose impeachment evidence offered by Rickedda Young: defendants Joseph Stevens and Scott Mastroianni;

- Failure to disclose the circumstances surrounding Bryce Croft's statement: defendant Doug Palmer;

- Failure to disclose the improper police tactics that produced Lautaurean Brown's statement: defendants Joseph Stevens and Doug Palmer; and

- Failure to timely disclose the recordings of Alex Dowthard's jailhouse telephone calls: defendant Joseph Stevens.

As for the remaining defendants named in Count I (on either theory), we affirm the entry of summary judgment in favor of defendants Theo Glover, Dominic Iasparro, James Randall, and Torrey Regez because the plaintiffs have failed to set forth any arguments or identify any evidence that any of these officers engaged in any of the alleged due process violations.

Turning to Count II (failure to intervene), Count III (conspiracy), and Count VII (supervisor liability), the district court concluded that the defendants necessarily were entitled to summary judgment owing to its determination that plaintiffs

failed to bring forth enough evidence to support their *Brady* and fabrication allegations. In these circumstances, and especially given the expanse and complexity of the factual record, remand is appropriate to allow the district court to consider each of these claims in the first instance—and to determine whether they may proceed and, if so, against which defendants.

The district court also granted summary judgment on Count VIII (§ 1983 malicious prosecution) and Count IX (Illinois malicious prosecution). We affirm this aspect of the district court's judgment. Beginning with the § 1983 claim, the plaintiffs' amended complaint alleges that the defendant officers violated their rights under the Fourth and Fourteenth Amendments by improperly subjecting them to judicial proceedings without probable cause. But "[t]here is no such thing as a constitutional right not to be prosecuted without probable cause." *Manuel v. City of Joliet, Illinois*, 903 F.3d 667, 670 (7th Cir. 2018) (quoting *Serino v. Hensley*, 735 F.3d 588, 593 (7th Cir. 2013)). There is, however, "a constitutional right not to be held in custody without probable cause," *id*., and the Supreme Court has "ma[de] clear that the Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention," *Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2019) (citing *Manuel v. City of Joliet, Illinois*, 137 S. Ct. 911 (2017)).

The plaintiffs do not assert they were subjected to pretrial detention (though evidence in the record suggests they were)—but even if they had, their claim would still fail because it hinges upon showing the absence of probable cause to support their arrests and confinement. The record supports

the district court's conclusion that at least some of the defendant officers reasonably believed that the plaintiffs were guilty of murder based on the accounts given by Dowthard and Brown. And it cannot reasonably be disputed that the written statements of Dowthard and Brown provided probable cause to support the arrests. Summary judgment, therefore, was appropriate on the plaintiffs' federal claim. Because an Illinois claim for malicious prosecution likewise requires the absence of probable cause, the district court properly granted summary judgment on this claim as well. See *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009) (identifying the elements of a malicious prosecution claim under Illinois law).

Finally, the district court concluded that the City of Rockford was entitled to summary judgment on Count XI (respondeat superior) and Count XII (indemnification) because the plaintiffs failed to maintain a claim against any defendant police officer. In light of our conclusion regarding the potential liability of certain individual officers, the entry of summary judgment on these claims was likewise premature. We leave it to the district court to evaluate these claims on the merits in the first instance on remand. For the sake of completeness, however, we note that the district court rejected the plaintiffs' claims against the City premised on a *Monell* theory of liability. Because the plaintiffs failed to challenge this aspect of the district court's ruling, we consider this argument waived and the plaintiffs may not seek to revive this aspect of their claims on remand.

For all of these reasons, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings.