In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1564

BERNARD MIMS,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 1:18-cv-07192 — **Steven C. Seeger,** *Judge.*

ARGUED SEPTEMBER 17, 2025 — DECIDED OCTOBER 21, 2025

Before SCUDDER, PRYOR, and KOLAR, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Bernard Mims served ten years in prison for a murder an Illinois court later determined he did not commit. Mims then invoked 42 U.S.C. § 1983 and sued the City of Chicago and members of its police department, alleging, among other claims, that two detectives violated his due process rights under *Brady v. Maryland,* 373 U.S. 83 (1963), by concealing an exculpatory audio recording from the prosecution in his criminal trial. The district court determined that

Mims failed to show the detectives concealed or otherwise withheld the recording from the prosecutor. We agree and affirm.

**I**

A

On October 12, 2000, Dwayne Baker was working as a security guard at the Rosenwald, a public housing building on East 47th Street in Chicago. Shortly after midnight, a gold SUV pulled up to the gas station across the street from the building's front entrance. Two individuals then exited the SUV, and one began firing an AK-47 in the direction of the Rosenwald. The shooter killed Baker and injured another bystander.

Chicago Police Department Detective Daniel McNally began his work on the homicide investigation later that day. In short order, CPD came to believe the shooting was gang related, part of an ongoing feud between the Black Disciples and the Gangster Disciples. Early indications suggested that the shooter had mistaken Baker for a member of the Gangster Disciples.

In February 2001, Detective McNally interviewed Melvin Richardson, a member of the Black Disciples, who denied involvement in the Baker murder. In the course of the interview, however, Richardson described a conversation he had a few months earlier with Michael Sardin, a fellow Black Disciples member. By Richardson's telling, Sardin stated that he and two other Black Disciples, Taboo McNeal and Dwayne Chester, drove a truck to the Rosenwald to shoot rivals and, more specifically, that Chester fired shots at the building. Based on this information, Detective McNally sought to use Richardson

more proactively in the ongoing investigation of the Baker murder. He did so by seeking court approval to authorize Richardson to transmit his future conversations for law enforcement to record—essentially to wear a wire—a form of authorization the parties refer to as a "confidential overhear."

Detective McNally submitted the application to Cook County Circuit Court Judge Michael Toomin. Earlier in the year, Judge Toomin had twice before authorized confidential overhear recordings related to the Baker homicide. The parties refer to those prior authorizations as "COH 003" and "COH 007," with "COH" being the shorthand for a confidential overhear. These details become important.

On February 21, 2001, Judge Toomin authorized the third confidential overhear, COH 013. His order allowed Detective McNally, other CPD officers, and various members of the Cook County State's Attorney's Office to record and listen to conversations between Richardson and Sardin, among others with suspected involvement in the Baker homicide.

Key to this appeal, the COH 013 recordings generated five audio files. We focus on one that captured a conversation between Richardson and Sardin in late February or early March 2001. During their discussion—construed most favorably to Mims—Sardin confirmed that he previously claimed involvement in the Baker murder. But, for much of their exchange, Sardin appears to backtrack by denying many times over any actual involvement in the crime.

Upon listening to the recordings associated with COH 013, Detective McNally became concerned that Richardson had tipped off Sardin that their conversations were being taped. As a result, Detective McNally decided to stop using

Richardson as a confidential informant. Even more, everyone seems to agree that, from that time forward, Detective McNally had no further role in the Baker homicide investigation.

In March 2001, Judge Toomin entered an order stating that he had listened to all of the COH 013 recordings, as required by Illinois law. See 725 ILCS 5/108A-7(b). He also ordered the original recordings "to be impounded and held in the custody of the Clerk of the Circuit Court under seal." Judge Toomin further ordered the Cook County State's Attorney's Office to keep a set of copies.

These early investigative steps did not lead to an immediate arrest in the Baker homicide. Later in 2001, however, CPD's Cold Case Squad took a fresh look at the crime. For his part, Detective Ted Przepiora conducted interviews and came to view Bernard Mims as a potential suspect.

But the investigation again went quiet until a series of reinterviews in 2003 and 2004 reinvigorated interest in Mims. Around this same time, Assistant State's Attorney William Delaney, a prosecutor in the cold case homicide unit within the Cook County State's Attorney's Office, became involved in the investigation. In July 2004, ASA Delaney helped Detective Przepiora secure a warrant to arrest Mims for the murder of Dwayne Baker. Not long after, a Cook County grand jury indicted Mims on one count of first-degree murder and three counts of attempted murder.

The case against Mims proceeded before Judge Toomin. ASA Delaney led the prosecution, and Daniel Franks served as Mims's counsel. At multiple pretrial hearings, the parties discussed the three investigative confidential overhears

(COH 003, COH 007, and COH 013). In the course of discovery, ASA Delaney produced two of the five recordings made pursuant to COH 013. But neither of those recordings contained the discussion between Melvin Richardson and Michael Sardin that confirmed Sardin's prior claim of involvement in the Baker homicide. That particular recording, along with two others, was not turned over to Franks, and in time that lack of production would come to form the basis of Mims's civil *Brady* claim.

But the record does show that ASA Delaney provided defense counsel Franks with copies of all affidavits and judicial orders associated with all three confidential overhear applications (again, COHs 003, 007, and 013). The COH 013 application materials contained express references to the initial conversation between Richardson and Sardin that forms the foundation of Mims's *Brady* claim. To date, no actual recordings from COH 003 or COH 007 have been located. Nor does this appeal in any way relate to information believed to be recorded as part of those two authorizations.

In the end, Mims opted for a bench trial before Judge Toomin. The trial ended in a conviction for the first-degree murder of Dwayne Baker and the attempted murder of bystanders present at the Rosenwald at the time of the shooting. Judge Toomin sentenced Mims to 95 years' imprisonment.

In 2015, when Mims was about ten years into his sentence, the Conviction Integrity Unit of the Cook County State's Attorney's Office took a renewed look at the case against him. In October 2016, the Office petitioned the Circuit Court of Cook County to vacate Mims's conviction and sentence. The court granted the petition the same day and ordered his immediate release. The Cook County State's Attorney's Office

issued an accompanying press statement explaining that a se-
ries of factors—all unrelated to the *Brady* claim before us on
appeal—led it to lack confidence in Mims's murder convic-
tion. In November 2016, Mims obtained a Certificate of Inno-
cence from the Circuit Court of Cook County.

B

Mims reacted to these developments by filing this § 1983
action against the City of Chicago and nine CPD detectives.
He alleged wrongful conviction and sought civil damages on
a range of claims under the U.S. Constitution and state law.
Our focus is on the facts pertinent to the only claim before us
on appeal—Mims's contention that Detectives Daniel
McNally and Ted Przepiora violated his due process rights
under *Brady* by concealing the recording of a discussion be-
tween Melvin Richardson and Michael Sardin. Mims views
the conversation as exculpatory because it confirms that Sar-
din previously identified someone else as responsible for
shooting and killing Dwayne Baker. For purposes of this ap-
peal, although the recording is far from clear, we accept
Mims's characterization of its contents.

During discovery in federal court, a Cook County Circuit
Court judge ordered the Clerk of Court to release all im-
pounded and sealed recordings created pursuant to COHs
003, 007, and 013. We glean from the parties' briefs that what
followed was the production of all five original recordings
made pursuant to COH 013.

Over time the parties have narrowed the defendants and
claims at issue in this case. The district court ultimately en-
tered summary judgment for the City and police detectives
on all four of Mims's remaining claims: concealment of

evidence in violation of his due process rights under *Brady*, fabrication of evidence in violation of his due process rights, and two state law claims involving the City's financial responsibility for the alleged misconduct. Mims has further narrowed our focus on appeal. He challenges only the district court's entry of summary judgment on the first claim, which alleged that Detectives McNally and Przepiora suppressed the exculpatory recording of Richardson and Sardin in violation of *Brady*.

The district court rejected the *Brady* claim on several grounds. The district court first acknowledged that Mims's trial counsel, Daniel Franks, received only two of five recordings made pursuant to COH 013. But it then determined that Mims failed to identify evidence permitting a jury to find that Detectives McNally and Przepiora withheld the Richardson-Sardin recording from the prosecutor. The district court also concluded that Mims's claim failed for the independent reason that the Richardson-Sardin conversation was not material within the meaning of *Brady*. More specifically, the district court found that there was no reasonable probability that Judge Toomin's verdict would have changed had defense counsel received the Richardson-Sardin recording in discovery.

Finally, by way of alternative reasoning, the district court determined that qualified immunity protected Detectives McNally and Przepiora from § 1983 liability. It found no clearly established law requiring police officers to ensure that defense counsel receives court-impounded materials to which the prosecutor, here Assistant State's Attorney William Delaney, had access at all relevant times.

This appeal followed.

**II**

We review the district court's award of summary judgment by taking our own independent look at the facts and the law, drawing all inferences in favor of Mims as the non-moving party. See *Davis v. Rook*, 107 F.4th 777, 780 (7th Cir. 2024). We will affirm if Mims has not met "his burden to produce sufficient evidence—not mere speculation—on each essential element of his [*Brady*] claim[]." *Moran v. Calumet City*, 54 F.4th 483, 491 (7th Cir. 2022).

A

In *Brady*, the Supreme Court translated the Constitution's broad guarantee of due process into a practical protection, holding that "the suppression by the prosecution of evidence favorable to an accused … violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. *Brady*'s protection recognizes the "special role played by the American prosecutor in the search for truth in criminal trials" by imposing an affirmative duty on prosecutors to learn of and to disclose to defendants all potentially exculpatory evidence, including evidence known only to police. *Strickler v. Greene*, 527 U.S. 263, 281 (1999); see also *Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir. 2019) (articulating the same standard).

The prosecutor's broad duty of disclosure does not shield the police from all responsibility under *Brady*, however. If police officers conceal exculpatory evidence from the prosecution, their actions can form the basis of a due process violation. See *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). To prevail on a *Brady* claim against a police officer, a

criminal defendant must show that the non-disclosed evidence was favorable to him, the police officer concealed or suppressed that evidence, and, finally, that the withheld evidence resulted in prejudice. See *Jones v. York*, 34 F.4th 550, 559 (7th Cir. 2022).

Under *Brady*, suppression requires a showing that the "prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence" and "the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Concealed evidence is prejudicial, and therefore material, if there is a reasonable probability that the outcome of a proceeding would have been different if the evidence had been disclosed. See *Strickler*, 527 U.S. at 280.

But the law is equally clear that *Brady*'s disclosure obligation rests primarily with the prosecution. See *Moran*, 54 F.4th at 492. "[O]ur case law has established that the police generally discharge their *Brady* duty by turning over exculpatory evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation." *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015). Put another way, a criminal defendant generally cannot establish a *Brady* violation by pointing to a police failure to disclose exculpatory evidence if the prosecutor was aware of that evidence or obtained it from another source. See *Moran*, 54 F.4th at 492–93.

A criminal defendant who, like Mims, later becomes the plaintiff in a civil suit under § 1983 faces an additional hurdle when seeking damages for a *Brady*-based due process violation by a police officer. See *id.* at 493. In the civil context, "negligent conduct does not offend the Due Process Clause." *Id*.

(quoting *Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018)). We consider evidence "suppressed in a § 1983 suit only if a police officer 'acted intentionally or at least recklessly' in failing to turn it over to the prosecution." *Id.* To be sure, we have not resolved whether reckless conduct can create liability for a *Brady* suppression claim. See *id.* Nor does this case require us to do so. We can proceed by assuming—and without deciding—that "reckless failure to disclose exculpatory evidence constitutes suppression." *Id.*

B

Turning to the merits, Mims contends that Detectives McNally and Przepiora violated *Brady* by suppressing—at all stages of his prosecution in the Cook County Criminal Court—the recording containing the discussion between Melvin Richardson and Michael Sardin. Like the district court, we cannot get there. Above all else, we agree that Mims has not come forward with evidence that Detective McNally or Detective Przepiora concealed or otherwise withheld this recording from ASA William Delaney.

One essential and undisputed fact stands out and warrants emphasis. At all times during the underlying prosecution, all five recordings made pursuant to COH 013, including the recording of the Richardson-Sardin discussion Mims features in his *Brady* claim, were available in a file at the Cook County Circuit Court. Mims's trial before Judge Toomin took place in 2006. Five years earlier, in 2001, Judge Toomin ordered the impoundment of all original COH 013 recordings with the Clerk of Court, with the accompanying directive that the Cook County State's Attorney's Office keep a set of copies. Discovery in this case confirmed that the original Richardson-

Sardin recording was part of the Cook County Circuit Court file.

The record also shows that ASA William Delaney and Mims's defense counsel, Daniel Franks, knew of the three court orders authorizing the confidential recordings during the Baker homicide investigation. Indeed, recall that ASA Delaney produced the affidavits and orders related to all authorized recordings (COH 003, COH 007, COH 013) as part of discovery in the underlying criminal case. And, when it came to COH 013, ASA Delaney provided Franks with two of the five recordings.

The record further reveals that ASA Delaney not only understood that any recordings generated pursuant to Judge Toomin's confidential overhear orders would be impounded at the Cook County Circuit Court, but that he also knew how to access the impounded court files. Specifically, at a pretrial hearing in August 2005, ASA Delaney made clear that he expected Judge Toomin to have sealed any recordings made under COH 013. And, as he tried to identify whether recordings existed pursuant to COH 003 or 007, ASA Delaney actually obtained a judicial order on June 13, 2005 that directed the Clerk of the Circuit Court to release to him any sealed and impounded original recordings related to those two confidential overhears.

Make no mistake, we are not suggesting that ASA Delaney knew that the COH 013 court file contained three recordings beyond those he provided to Mims's attorney in discovery. But what we are saying is that the record leaves us no doubt that the Cook County court file containing the COH 013 recordings was itself known and accessible to ASA Delaney prior to Mims's criminal trial.

Mims urges a different focus. He invites us to concentrate on ASA Delaney's specific unawareness of the key recording of Richardson and Sardin and, from there, to conclude that Detectives McNally and Przepiora concealed or otherwise withheld that particular recording. On his account, Mims suggests that the detectives had copies of all five recordings and deliberately provided the prosecutor with an incomplete set, thereby explaining why ASA Delaney only produced two of the five recordings that made up COH 013.

But therein lies the analytical misstep. Mims is asking the wrong party to shoulder responsibility for the failed disclosure. The affirmative duty to discover and disclose exculpatory evidence primarily falls to the prosecutor. "[O]nce the prosecution has the evidence, it is the prosecution's—not the officer's—duty to disclose it to the defense." *Moran*, 54 F.4th at 493. In no uncertain terms, the record shows that ASA Delaney had knowledge of and access to the court file containing the recordings that resulted from COH 013, including the recording of the allegedly exculpatory Richardson-Sardin discussion. Further, Judge Toomin had ordered the Cook County State's Attorney's Office to maintain a full set of copies of the recordings.

On these facts, we do not see how the police were responsible when the recording of Richardson and Sardin did not end up in Mims's counsel's hands. Even if ASA Delaney received (or expected to receive) copies of certain recordings from the police, that fact would not relieve him of his affirmative obligation to ensure the completeness of his disclosure, especially given that he knew of COH 013 and had independent access to the complete recordings. On the record before the district court, no reasonable jury could find that Detective

McNally or Detective Przepiora concealed a recording that was readily available to the prosecution through another known source.

Nor, it is worth underscoring, does Mims provide affirmative evidence that Detective McNally or Detective Przepiora misled ASA Delaney by, for example, misdirecting or preventing him from seeking a recording he could otherwise have located and disclosed. Mims asks us to infer that ASA Delaney relied on the detectives to obtain the two recordings from COH 013 that he did produce to defense counsel Daniel Franks which, in turn, supports the inference that the detectives withheld the non-disclosed recordings. But this contention finds no footing in the summary judgment record developed in the district court. ASA Delaney could not recall the source of the two recordings he disclosed, which—given Judge Toomin's March 2001 order—could plausibly have been in a file within the State's Attorney's Office.

And the other evidence connecting Detectives McNally and Przepiora to the recordings is too attenuated to support Mims's theory of suppression. The record shows that Detective McNally listened to the COH 013 recordings back in 2001. But he denied creating copies and testified that he believed the State's Attorney's Office retained possession of all recordings. To jump from his listening to the recordings to intentional or reckless concealment is too speculative—especially given that Detective McNally stopped working on the Baker homicide investigation nearly three years before Mims's arrest. We also see no evidence showing that Detective McNally aided ASA Delaney in gathering pretrial discovery.

Another piece of evidence deserves highlighting. At his deposition in this case, Detective McNally testified that he

thought the State's Attorney's Office had possession of the COH 013 recordings after he listened to them and that, eventually, the Cook County Court impounded all recordings. Detective McNally therefore had reason to believe all five COH 013 recordings would be available to the prosecution regardless of his actions, undermining his motive to intentionally or recklessly conceal the recordings. See *Moran*, 54 F.4th at 495 (reasoning that a police officer who knew of another agency's obligation to send a particular report to the prosecution "could not have thought that he had the power to conceal the report," corroborating his claim to have mistakenly failed to send it to lead detectives). In short, the record does not support an inference that Detective McNally acted with either mental state required for Mims to succeed on his § 1983 civil *Brady* claim.

We have even more difficulty with Mims's *Brady* claim against Detective Przepiora. We see no evidence suggesting that Detective Przepiora ever knew about the Richardson-Sardin recording. That evidentiary gap leaves us with no choice but to uphold the district court's entry of summary judgment for Detective Przepiora.

We have also considered whether the recording of Melvin Richardson and Michael Sardin is material within the meaning of *Brady*. On one view, Mims was already on notice that Sardin and others may have been involved in the murder because his counsel, Daniel Franks, received the affidavits supporting the application for COH 013. Mims insists that Sardin's admission in recorded form would have made a difference. See *Moran*, 54 F.4th at 496 ("The form of evidence produced is only relevant for *Brady* purposes when evidence in one form would be more helpful to the defense than evidence

in another form….”). Ultimately we need not reach this question because the materiality of evidence is not relevant under *Brady* unless evidence is suppressed. We resolve this appeal based solely on Mims's failure to show that either Detective McNally or Detective Przepiora concealed or otherwise withheld the recording. This conclusion likewise obviates any need to go further and reach the alternative reasoning of the district court regarding qualified immunity.

\* \* \*

In the final analysis, then, we agree with the district court's entry of summary judgment for Detectives McNally and Przepiora. We do not reach this conclusion lightly, for we fully understand Mims's desire to hold someone accountable for his wrongful conviction. But we must decide the case on the law as it stands and on the factual record developed in the district court. Mims's *Brady* claim fell short, leaving us no option but to AFFIRM.