In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 12-3303

RIVERA PETTY, as Administratrix of the Estate of Timothy Petty, Deceased,[1]

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO, ET AL.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 07 CV 7013 — **Wayne R. Andersen** and **Virginia M. Kendall**, *Judges*.

_____

ARGUED SEPTEMBER 17, 2013 — DECIDED DATE JUNE 9, 2014

_____

Before WILLIAMS, SYKES, and TINDER, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Timothy Petty was arrested on the suspicion that he, along with another person, shot and killed Albert Counsel and wounded two others. Petty was

---

[1] After oral argument, but before this case was decided, Timothy Petty passed away. His mother, as administratrix of his estate, continues this case in his place and is substituted as party plaintiff.

identified as the shooter and was indicted for murder, but was found not guilty after a bench trial. After his acquittal, Petty filed a suit under 42 U.S.C. § 1983 against the City of Chicago and individual Chicago Police Department officers arguing that the officers violated his due process rights by intentionally mishandling the shooting investigation and prosecuting him for murder based on falsified evidence. Specifically, Petty alleged that CPD officers held a witness, Fredrick Tarver, in a room for over 13 hours without food, water, or access to a bathroom until he implicated him. But Petty's argument fails because his "coerced evidence" claim is not cognizable under the Due Process Clause.

In addition, Petty alleged that Defendants concealed evidence and failed to disclose their misconduct in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). We disagree. Summary judgment was proper here because Petty was aware of the Defendant's alleged misconduct before trial and had ample opportunity to make use of the information at trial. Finally, he claimed that the City was liable for the police officers' conduct because it had a policy of detaining people believed to be crime witnesses for extended periods of time against their will. But his *Monell* claim also fails because he did not suffer a constitutional injury sufficient to support it.[2] Therefore, we affirm the district courts' decision.

## I. BACKGROUND

### A. The Shooting and the Identifications

---

[2] After Judge Andersen dismissed Petty's *Monell* claim, the case was transferred to Judge Kendall, who ruled on the summary judgment motion.

In the early morning of October 18, 2003, two individuals shot and killed Albert Council, wounding Sebastian Moore and Lowell Hubbard. Minutes after the shooting, Chicago Police Department ("CPD") officers arrived at the scene and were told by witnesses that the shooters were African-Americans who wore dark clothing, masks, and skull caps. Officers brought witnesses Frederick Tarver and Mario Parker to CPD Area 3 Headquarters for further questioning. Between 13 to 17 hours later, Tarver selected Timothy Petty's photo from a photo array and identified him as a shooter.

On November 29, Petty, also known as "Spank," was arrested on an outstanding warrant and after Moore also positively identified Petty as one of the shooters murder charges were filed against him. On December 19, Petty was indicted for murder and held in custody for 33 months pending trial.

## B. Petty's Motions Before His Bench Trial

In state court, Petty moved to quash his arrest and suppress any evidence that arose from it, arguing that he was arrested without a valid warrant or probable cause. After hearing testimony from CPD officers regarding their conduct surrounding Tarver's positive identification of Petty, his motion was denied.

Petty filed a second motion to suppress Tarver's identification testimony, alleging that Tarver recanted his identification and only made the initial false identification because police officers told him who to pick out of the line-up. At the hearing, Tarver said the police tried to make him pick Petty from the line-up, and that he had told the officers he was not sure whether Petty was the shooter. He also testified that he was not allowed to leave the police station after the line-up

and was left in a locked room until the next morning. Tarver said Defendant Detective Michael Conway threatened to have his parole revoked if he did not help convict Petty. When Tarver was shown the picture of Petty with his signature on it, Tarver said that the signature looked like his but he did not remember seeing or signing the picture. Tarver also stated that he had filed a civil lawsuit against the police for their conduct and that the suit was pending. After a hearing, the state court judge denied Petty's motion, finding that Tarver identified "Spank" to the police and that the police acted in good faith and committed no misconduct. At a bench trial, Petty was tried for murder and found not guilty. Petty then filed a suit under 42 U.S.C. § 1983 against the City and Defendants, which they removed to federal court.

**C. Petty's Civil Suit**

In his complaint, Petty alleged that the City was liable for the police officers' conduct under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Specifically, he asserted that the City had a policy of detaining people believed to be witnesses to crimes for extended periods of time against their will. The City moved to dismiss Petty's *Monell* claim, arguing that Petty could not have suffered a constitutional violation because he was not the one detained, and without a direct link, he could not establish a direct connection between the City's alleged policy and his alleged injury. Judge Andersen granted the City's motion to dismiss.

In the same complaint, Petty alleged that the individual officers: (1) violated his due process right to a fair trial by inducing prosecutors to wrongfully prosecute him; and (2) deprived him of exculpatory information in violation of

*Brady v. Maryland*, 373 U.S. 83 (1963). He claimed that the individual defendants coerced Tarver into falsely identifying Petty as the shooter by holding him against his will at the police station, harassing him at his home, and arresting and refusing to release him until he identified Petty from a line-up. He believes that CPD officers violated *Brady* because they failed to tell prosecutors how Tarver's identification was secured.

When the case was transferred to Judge Kendall, Defendants moved for summary judgment on Petty's due process and *Brady* claims and they filed a statement of undisputed facts under United States District Court for the Northern District of Illinois Local Rule 56.1. In Petty's response in opposition, he admitted everything in the Defendants' statement of facts and submitted a 56.1 statement with 169-paragraphs of additional facts. Petty also provided 42 exhibits spanning 480 pages.

Defendants moved to strike all but the first 40 paragraphs of Petty's 56.1 statement citing Local Rule 56.1, which prohibits a party from submitting more than 40 paragraphs without permission from the court. The district court struck all those additional facts because Petty never sought, nor received, permission to file additional paragraphs and granted summary judgment in favor of the Defendants.

Petty filed a motion to reconsider the court's ruling, citing *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012), which had been decided a day before the district court ruled against him. He argued that *Whitlock* held that the deliberate manufacture of false evidence violates the Due Process Clause and that the district court's decision contradicted *Whitlock*. He also moved for leave to file a statement that

contained more than 40 paragraphs. The court denied his request to file the additional paragraphs and his motion for reconsideration. He now appeals that decision as well as the grant of summary judgment as to all of his federal claims, and the dismissal of his *Monell* claim against the City.

## II. ANALYSIS

First, Petty contends that the district court should have allowed him to submit a fact statement in excess of 40 paragraphs. Second, he argues that the district court erred when it granted summary judgment for the City on his due process and *Brady* claims. Finally, he asserts that it was error for the district court to dismiss his *Monell* claim. We address these issues below.

### A. No Error in Striking Petty's Additional Facts

Petty contends the district court abused its discretion by striking his additional fact statements in excess of that allowed by local rules. A party filing a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure must file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." N.D. Ill. Local R. 56.1(a)(3). The non-moving party must file a response to the moving party's statement, and, in the case of any disagreement, cite "specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104, 1108 (7th Cir. 2004) (quoting N.D. Ill. Local R. 56.1(b)(3)(A)). According to Local R. 56.1(b)(3)(C) "[a]bsent prior leave of Court, a respondent to a summary judgment motion shall not file more than 40 separately-numbered

statements of additional facts." We review district court decisions concerning compliance with local rules for abuse of discretion. *Id*.

Petty argues that the district court should have given him greater leeway to submit more than 40 paragraphs given the complexity of the case, but we do not agree. Petty violated Local Rule 56.1 by submitting additional facts in excess of the 40 permitted without permission from the court, and tries to justify his error by arguing that malicious prosecutions and due process cases are so fact intensive that the paragraph limitation is simply not practical. While this kind of case may be more complex, Local Rule 56.1 contemplates this very problem and outlines how movants may address their concerns within the confines of the rule. *See* Local R. 56.1 Committee Comment ("A party may seek leave to file more asserted statements of … additional fact, upon a showing that the complexity of the case requires a relaxation of the … 40 statement limit."). If Petty felt that his case required the district court to relax the limit, he should have asked the court to excuse compliance with its rule *before* he submitted his additional statement of facts that violated the court's rule. But, he did not do that. We have said that district courts may require parties to strictly adhere to their rules. *See Elustra v. Mineo*, 595 F.3d 699, 710 (7th Cir. 2010). Because Petty had the opportunity to comply with Local Rule 56.1 but chose not to, the district court did not abuse its discretion by striking those additional facts.

Petty also argues that the district court was "overly harsh" in striking his additional paragraphs. We disagree. We have stated that "it is not the parties['] prerogative to determine when a rule can be satisfied by other than what the

rule requires." *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995). If parties fail to comply with local rules, they "must suffer the consequences, harsh or not." *Id.* We have "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Koszola*, 385 F.3d at 1109 (quoting *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002)).

Finally, Petty argues that the district court's striking of his excess paragraphs harmed him. Once again, we do not agree. The court's ruling did not negatively impact his case. In addition to Petty's admitted 40 paragraphs, he agreed to all of the City's statements of material fact, which referenced: (1) Petty's allegations regarding CPD officers' treatment of Tarver; (2) whether the attorney tasked with prosecuting the case would have brought charges if she had known how CPD officers treated Tarver; and (3) that Tarver's subsequent lawsuit was disclosed to Petty during the course of his murder trial. Although Petty's excess paragraphs were struck, enough facts remained for the court to rule on his due process, *Brady*, and *Monell* claims.

### B. Summary Judgment Was Proper on Due Process and *Brady* Claims

Petty contends that the district court erred when it granted summary judgment for the City on his due process and *Brady* claims. We review the district court's grant of summary judgment de novo, construing the facts in the light most favorable to the non-moving party. *Mercatus Group, L.L.C. v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011).

Petty alleges that CPD officers systemically wore down Tarver by placing him in a locked room that had no windows or toilets, and then deprived him of food, water, and sleeping arrangements for over 13 hours until Tarver falsely identified Petty as the shooter. Additionally, Petty claims they did not disclose to the prosecutor that Tarver was coerced into implicating Petty.

While Petty makes allegations that would concern any court and would require close scrutiny of police tactics, an examination of the record reveals that Petty's allegations do not reveal that the police committed a *Brady* violation or violated *his* due process rights.

### 1. No Due Process Claim

Petty argues that CPD officers violated his right to due process by manufacturing evidence against him and coerced Tarver into giving false witness statements inculpating him. In the past, we have labeled a claim like Petty's as a malicious prosecution claim. *See McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003) (stating that an allegation of manufacturing evidence is an "in essence, one for malicious prosecution, rather than a due process violation"). And we did not allow the claims to be brought in federal court because there was an adequate state law remedy. *See Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010) (stating that "a plaintiff cannot invoke the substantive due process clause where state laws provide an adequate postdeprivation remedy for the complained-of conduct"). Following that precedent, Petty's claim would have been barred from being brought in federal court because Illinois provides an adequate remedy for his malicious prosecution claim. *See Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011) (stating that the plaintiff cannot bring

a Section 1983 malicious prosecution suit because Illinois law recognizes tort claims for malicious prosecution). Petty argues that we recently changed how we examine these cases in *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012), and should be willing to allow his claim to stand. We need not address his argument because, as discussed below, this is a coercion case, not a fabrication case like *Whitlock*.

In *Whitlock*, two police officers, an Illinois State Police investigator, and a State's Attorney formed an "investigative team" that conspired to frame two men for murder, and covered up their alleged misdeeds for two decades. The two defendants were convicted of murder, but were later exonerated. The police officers and prosecutor allegedly fabricated the testimony of two witnesses who were essential to the State's case. We have "consistently held that a police officer who manufactures false evidence against a criminal defendant violate[d] due process if that evidence is later used to deprive the defendant of her liberty in some way." 682 F.3d at 580. And we stated that there was no reason that the same logic should not apply to prosecutors acting in an investigatory capacity who fabricate evidence that is used to obtain a wrongful criminal conviction. *Id*.

More recently, we had the opportunity, in *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ("*Fields II*"), to comment on *Whitlock* and its effect on due process jurisprudence. In *Fields II*, we stated that a prosecutor who falsely creates evidence against a defendant violates the defendant's due process right. 740 F.3d at 1114. We also explained that there is a difference between coercing witnesses to testify and fabricating witness testimony. *Id*. at 1110 ("Coerced testimony is testimony that a witness is forced by improper means to give;

the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.").

In fabrication cases, the police or prosecutor manufactures evidence that he knows to be false. *See, e.g., id.* (the prosecutor fabricated evidence that he knew to be false from a prospective witness); *Whitlock*, 682 F.3d at 571-72 (the prosecutor was a part of an investigative team that told witnesses what to say knowing that the information they gave the witnesses was false). As we said in *Fields II* and reiterate here, a prosecutor fabricating evidence that she knows to be false is different than getting "a reluctant witness to say what may be true." *See* 740 F.3d at 1112.

In *Buckley v. Fitzsimmons*, we explained that "[c]oercing witnesses to speak … is a genuine constitutional wrong, but the persons aggrieved [are the witnesses] rather than [the arrestee]." 20 F.3d 789, 794 (7th Cir. 1994). Therefore, obtaining a statement with coercive tactics that inculpated the arrestee may have violated the witness's rights, but it did not violate the arrestee's due process rights. *Id.* In *Whitlock*, we emphasized the point when we observed that "[c]oercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial," because "[e]vidence collected with these kinds of suspect techniques, unlike falsified evi-

dence and perjured testimony, may turn out to be true." 682 F.3d at 584.[3]

After carefully reviewing the record, applying *Fields II* and *Whitlock*, we conclude that Petty's claim fails because his claim is a "coercion" case for which there is no cognizable due process claim, as opposed to an "evidence fabrication" case where there is a cognizable claim. Although Petty's case appears to be a fabrication case because he alleges that the police "manufactured false evidence" and used "false identification" to prosecute him, a deeper look reveals that the case is more accurately described as a coercion case.

Petty alleges that CPD officers coerced Tarver into giving false evidence by threatening him with jail time if he did not cooperate, holding him against his will in a locked room without food or water for over 13 hours, badgering him, and pressuring him to identify Petty as one of the assailants. As a result of their alleged tactics, Petty argues that the Defendants knew or should have known that Tarver's statements

---

[3] Although *Buckley* and *Whitlock* examined the use of coerced and fabricated evidence as it relates to prosecutorial immunity, the same due process constitutional analysis that applies to prosecutors applies to police officers during the early stages of an investigation because the police and prosecutors are essentially performing the same investigatory function. *Fields II*, 740 F.3d at 1115; *Whitlock*, 682 F.3d at 580 (stating that a prosecutor acting in an investigatory capacity is subject to the same rules as a police officer because a "prosecutor who manufactures evidence when acting in an investigatory role can cause a due process violation just as easily as a police officer"). In *Whitlock*, we observed that it would be "incongruous to hold a police officer liable for fabricating evidence but hold that the prosecutor has not committed any violation for taking the same action in the same capacity." 682 F.3d at 580-81 (internal citation omitted).

were flawed. Although we do not decide here whether such actions amount to coercion, the tactics alleged in this case are similar in nature to other coercion cases. *See, e.g.*, *Buckley*, 20 F.3d at 794 (prosecutor threatened witnesses and repeatedly interrogated them). This is different than alleging that CPD officers created evidence that they knew to be false, which is the hallmark of a fabrication case. Petty's claim fails because he did not allege in his complaint, his statement of material facts in opposition to the Defendant's motion for summary judgment, or his appellate brief that CPD officers manufactured evidence that they knew to be false.

As we held in *Fields II*, the true nature of the claim matters and parties should be precise in their terminology. Although Petty may have used terms and phrases such as "manufactured false evidence" and "false identification," when one closely examines the evidence, it is clear that his case is a coercion case. There is not one shred of evidence to suggest that CPD officers fabricated evidence, which would have been a due process violation. "Manufactured false evidence" and "false identification" are not magic talismans that will transform a coercion case into an evidence fabrication case and give rise to a cognizable claim where one does not exist. Instead, we will look at the underlying facts of the claim. While Petty did not have the benefit of such a bright-line distinction when he initially brought his case, after *Fields II* and *Whitlock* plaintiffs should be cognizant of the terminology they use so as to not to confuse these two types of cases.

## 2. No *Brady* Claim

Next, Petty argues that CPD officers committed a *Brady* violation by not disclosing to the prosecutor how it obtained

Tarver's eyewitness statement. To succeed on a *Brady* claim, a plaintiff must show that: (1) the suppressed evidence is either exculpatory or impeaching and is favorable to the accused; (2) the government, either willfully or inadvertently, suppressed the evidence; and (3) the suppressed evidence resulted in prejudice. *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). To establish that evidence was suppressed, a plaintiff must demonstrate that: "(1) the state failed to disclose known evidence before it was too late for [a defendant] to make use of the evidence; and (2) the evidence was not otherwise available to [a defendant] through the exercise of reasonable diligence." *Collier v. Davis*, 301 F.3d 843, 850 (7th Cir. 2002). The relevant inquiry is not whether the City disclosed the potentially exculpatory information *at all*, but whether Petty had sufficient time to use any exculpatory information revealed to him during trial.

Petty knew of the City's alleged misconduct before his trial started. He was so aware, in fact, that he tried to suppress all evidence that emanated from it. At the motion to suppress hearing, Petty called Tarver to testify about CPD officers' alleged violation. Tarver testified that he felt threatened and coerced by the police into identifying Petty as the shooter. Tarver also stated that he had a civil suit pending against the police for their treatment of him. After hearing all the evidence, the court found no police misconduct and Petty was acquitted at the bench trial.

Petty not only knew of Tarver's treatment before his trial began, he had the opportunity to explore this topic at trial and could have subpoenaed the CPD officers to compel their testimony to cast doubt on Tarver's identification. Because Petty knew of Tarver's alleged coerced identification before

his trial started and had sufficient time to use that information at his trial, summary judgment was appropriate on the *Brady* claim.

### C. Petty's *Monell* Claim Was Properly Dismissed

Finally, Petty alleges that at the time of the shooting, CPD officers acted pursuant to the City's "widespread, permanent and well-settled" policy of detaining witnesses to crimes for extended periods of time against their will, which resulted in his arrest, charge, and detention for 2½ years. He argues that the district court erred when it dismissed his *Monell* claim for failing to provide sufficient evidence to support his claim. We review a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) de novo, construing the allegations in the light most favorable to the non-moving party. *Village of DePue, Ill. v. Exxon Mobil Corp.*, 537 F.3d 775, 782 (7th Cir. 2008).

Under *Monell v. Department of Social Service. of City of New York*, municipalities and other local governments can be held liable for a tortfeasor's actions that it employs. 436 U.S. 658, 690 (1978). For municipality liability to arise, however, there needs to be more than an employment relationship between the alleged tortfeasor and the municipality. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122 (1992). Liability only accrues if the tortfeasor inflicts a constitutional injury on the plaintiff in the execution of the government's policy or custom. *Id.*; s*ee also Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006). For a municipality to be held liable for a tortfeasor's actions, the municipality's custom or policy must deprive a claimant of his constitutional rights. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985) (plurality opinion) (stating that *Monell* teaches that the city may only

be held accountable if the [constitutional] deprivation was the result of municipal custom or policy). To establish municipal liability and prevail on his *Monell* claim, it is not enough for Petty to allege that CPD's alleged policy injured him. Rather, he must establish: (1) that *he* suffered a constitutional injury, and (2) that the City authorized or maintained a custom of approving the unconstitutional conduct. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994). But if no constitutional violation occurred in the first place, a *Monell* claim cannot be supported. *See Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010) ("[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee.").

Petty's *Monell* claim fails because he did not suffer a constitutional injury and so has no basis to support a *Monell* claim. In the past, we have said that "[i]t is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of [a plaintiff's] constitutional rights." *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) (quoting *King v. East St. Louis School Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007)). Coercing witnesses to secure information that may ultimately be false does not per se violate Petty's constitutional rights. *See Fields II*, 740 F.3d at 1112 (stating that "coercion per se does not make a prosecutor acting as an investigator liable should the coerced evidence be used to obtain a conviction of an innocent criminal defendant"). Even if the City had a policy of detaining witnesses until they gave up information, Petty's *Monell* claim could not succeed because it is not his rights that would be violated by such a policy. Since Petty's due process constitutional rights were not violated by CPD officers' allegedly coercive tactics, he cannot prevail on his *Mo-*

*nell* claim and the district court properly dismissed his claim. *See, e.g., Houskins*, 549 F.3d at 493. (stating that the plaintiff's *Monell* claim failed because she failed to establish that she was deprived of a constitutional right); *Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006) (finding that a municipality defendant cannot be liable under *Monell* for a policy or custom of inadequately training and supervising its police officers, unless the defendant violated a constitutional guarantee).

### III. CONCLUSION

We AFFIRM the judgment of the district court.