In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-1989

BRENDA JONES,

*Plaintiff-Appellant,*

*v.*

BRENT YORK, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 19-cv-699 — **William M. Conley**, *Judge.*

———————————

ARGUED JANUARY 13, 2022 — DECIDED MAY 16, 2022

———————————

Before HAMILTON, BRENNAN, and JACKSON-AKIWUMI, *Circuit Judges.*

BRENNAN, *Circuit Judge.* A fire consumed Brenda Jones's house in Adams County, Wisconsin in 2013. Brent York, an investigator with the county sheriff's office, initially concluded that an electrical malfunction caused the blaze. But when he learned that a friend of Jones, Alan Onopa, claimed to have a recording of Jones admitting to arson, he reopened the investigation.

In pursuit of this new lead, York interviewed several witnesses, including Jones and Onopa. York also analyzed Jones's telephone records and secured Onopa's recording. Ultimately, York concluded that Jones set her own house on fire, so he referred the matter to the Adams County district attorney, who charged Jones with arson. A jury found her guilty.

After trial, Jones was appointed new counsel and moved for postconviction relief, arguing, among other things, that her trial counsel was ineffective because he did not move to suppress Onopa's recording as created for the purpose of extortion. Before the court ruled on the matter, the district attorney conceded the motion and dropped all charges against Jones.

Jones then sued York and Adams County under 42 U.S.C. § 1983. She contended that York violated her due process rights by withholding exculpatory evidence, fabricating inculpatory evidence, testifying falsely at trial, and prosecuting her without probable cause. Adams County, she claims, contributed to these unconstitutional acts by permitting them as a matter of custom or policy. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The district court granted summary judgment to the defendants. We agree with the district court that no reasonable jury could find for Jones on any of her claims, so we affirm.

**I**

**A**

Shortly after dawn on February 17, 2013, a neighbor called Adams County dispatch to report that Jones's house was on fire. By this time, the house was mostly destroyed. Firefighters and other responders, including York, arrived promptly

at the scene. Jones, who had spent the night at her sister's house in a nearby town, returned to the property after receiving a call from York. She told him that ice dams had been leaking water into the walls and causing electrical problems—for example, electrical sockets were "popping." Jones had asked an electrician to investigate these issues, but the inspection had yet to occur. York concluded that electrical malfunctions caused the fire and closed the investigation.

Two weeks after the fire, Jones and a close friend, Alan Onopa, were staying at the Stardust Motel in Marshfield, Wisconsin. An argument broke out between them, though they hotly contest the details of what happened. According to Jones, Onopa became drunk and threatened to turn her in for burning her house down unless she gave him money. His threats moved from verbal to physical when, Jones recalled, Onopa put his hands on her throat. Jones fled the hotel and stayed the night at her sister's house.

Onopa disputes Jones's version. He told York he did not drink any alcohol that evening. As Onopa tells it, the conflict arose when he declined Jones's sexual advances, though later voicemails show his agitation and surprise at Jones's departure from the hotel. Whatever occurred during their argument set off a chain of events.

Jones responded in several ways. She reported the altercation to Officer Caleb Bornbach of the Marshfield Police Department, who documented their conversation in a police report. Per Bornbach's report, Jones told him about Onopa's behavior and what she perceived to be attempted extortion; she did not tell Bornbach that Onopa placed his hands on her throat. Jones also preemptively notified her insurance

company about Onopa's threat. She also tried calling York, but he did not answer.

In the days following, Onopa repeatedly called Jones, who refused to answer. Undeterred, he left voicemails, which the parties agree were "threatening." In these voicemails, Onopa warned that if Jones did not call him back, he would release a "recording." He insisted they needed to get their "stories straight." When Jones did not return his calls, Onopa followed through on his threat and called Jones's insurance company, telling the adjuster that he had a recording that proved Jones was responsible for the house fire.

On March 7, 2013, the insurance company notified York about Onopa's claim. Given this new information, York reopened the investigation. His inquiry continued for over one year, with York weighing the markedly different accounts of Jones and Onopa.

He began by meeting Jones on March 21, 2013. During their recorded conversation, Jones presented her version of what occurred at the hotel in Marshfield. She accused Onopa of threatening her by saying if she did not "take care of him" and give him money, he would turn her in for burning the house down. She also told York that, at some point during the dispute, Onopa "had [her] by the throat." Jones detailed her contact with the Marshfield Police Department and her insurance agent, and she alleged that Onopa took some of her belongings from the motel room.

Jones then played Onopa's voicemails for York. When York heard Onopa mention a "recording," York asked Jones what that meant. Jones denied the existence of any recording. Curious, York asked Jones to call Onopa in his presence so he

could listen while she inquired about the recording. Jones agreed.

That same day, York and Jones met at her sister's home to conduct the arranged phone call. The parties agree that York attempted to record this call, but when York looked for it later, he was unable to find it. Nevertheless, the parties substantially agree as to what Jones and Onopa discussed: Onopa said he would deliver the recording to Jones if she paid him $3,500; Jones (directed by York) asked Onopa how to avoid "getting in trouble"; and Onopa replied that Jones should keep their "agreement."

Jones later testified she did not know what "agreement" Onopa was referencing. For his part, York testified at Jones's trial that Onopa demanded the money as compensation for personal property he lost in the fire. Jones contends this mischaracterized Onopa's motive; in her view, Onopa's request for money was a brazen attempt at extortion.

A week later, Jones called Bornbach to supplement her initial police report. She told him that Onopa had grabbed her throat and that York had reopened the investigation. Bornbach said he intended to contact York, which he did later that day. Bornbach and York discussed the case, including Jones's allegation that Onopa put his hands on her throat.

York continued the investigation by interviewing Onopa on April 2, 2013. Onopa told York he had recorded Jones talking about burning her house down while they were both at a Motel 6 in the Chicago suburbs two or three days after the fire. York asked for and received this recording from Onopa. York listened to the recording and documented his understanding of what was said, including that background noise made it

difficult to clearly hear the voices. According to York, in the recording:

> [Onopa] … asked if Brenda had put something in the heater, and Brenda's answer was mostly unclear but I heard the word "match" in her answer. Brenda was then laughing and said, "I tried to stick it in the heater and it," the rest of her answer is unclear. Alan then said that he could not believe that she did all of that damage with just a match, and Brenda answered "ya."

Jones argues the female voice in the recording, alleged to be hers, is inaudible.

In late April 2013, York met with Jones again at the Adams County Sheriff's office for a voluntary interview. York reviewed with Jones her account of the fire and related events. This time, near the end of the interview, York informed Jones that he "believed … she had some involvement in starting her house fire." Upon learning this, Jones asked for an attorney, and York ended the interview.

Two weeks later, and three months after the fire, York interviewed Onopa a second time. York questioned Onopa about how he met Jones, what she had said about burning her house down, and when Onopa recorded Jones. During the interview, Onopa said he and Jones met at a bar a year before the fire, she made romantic advances, but he did not reciprocate. Still, over the next year they spent time together. Onopa recalled that Jones would sporadically discuss burning down her house, which was "falling apart," to collect the insurance money. To prepare, Jones installed smoke detectors to bring her house in compliance with the insurance policy. The

motivation for this plan, in Onopa's view, was to attract him into a relationship by obtaining a large amount of money. Onopa reported that Jones transferred mementos and other items to her sister's home in the Wausau area in the days and weeks before the fire.

Onopa also spoke about his post-fire interactions with Jones. According to Onopa, Jones described precisely how she burned down her house—using a blanket over an electric heater, and when that did not work, igniting the heater with a lighter. As to the recording, Onopa said he only wanted leverage in case Jones blamed him for the fire and a bargaining chip to retrieve the value of personal property destroyed in the fire.

In May 2013 York interviewed Jones's electrician. The electrician confirmed that Jones asked him to look at an electrical issue and said that Jones had not expressed any urgency about the problem. He also explained that no precise appointment time had been arranged; rather, he agreed to stop by in "the next couple of days." When the electrician stopped by to perform the work, he saw the fire department managing the remnants of Jones's house.

Four months after the fire, in June 2013, York obtained Jones's cell phone records from U.S. Cellular. Those records were dated between January 15 and February 28, 2013. A U.S. Cellular employee explained to York what the data in the various columns in the records meant. The records showed that between those dates, Jones used her phone only within Wisconsin. They also reflect the precise tower that relayed her cellphone signal—evidence later offered during Jones's trial to establish where she was on the night of the fire.

York also interviewed several other witnesses and sub-poenaed Jones's financial records. Then, nearly seventeen months after the fire, and thirteen months after expressing his suspicions to Jones that she caused the fire, York confronted Jones in a phone call. York explained that his investigation had revealed several red flags. For example, the cellphone records showed that the night of the fire she was at her house, not her sister's, much later than she had claimed. In addition, Jones said the insurance company had not disbursed any policy money yet, and York found it suspicious that Jones was not pursuing this disbursement more vigorously. Near the end of the call, York informed Jones that he believed she burned her house down.

York then referred the case to the Adams County District Attorney. The materials he submitted to the prosecutor did not contain Jones's allegation that Onopa grabbed her throat on March 3, 2013. Also missing was the March 21, 2013 phone-call recording that York had arranged between Jones and Onopa.

**B**

The district attorney filed a criminal complaint, signed by York, against Jones in Adams County Circuit Court. The complaint charged Jones with arson of a building with the intent to defraud.[1] Jones's trial counsel moved to dismiss, arguing that a fair trial was not possible because the missing March 21 recording constituted potentially or apparently exculpatory

---

[1] In Wisconsin, anyone who, "[b]y means of fire, intentionally damages any building with intent to defraud an insurer of that building" is guilty of a felony. WIS. STAT. § 943.02(1)(b).

evidence. The motion accused York of destroying the evidence, though York testified he could not find it.

The court denied the motion because the parties agreed that, if a recording of the phone call had been preserved, it would contain a conversation in which Onopa offered Jones his recording in exchange for $3,500, and that the contents of Onopa's recording were not discussed. The missing March 21 recording thus lacked potentially or apparently exculpatory value, nor was there any evidence of bad faith.

At trial in May 2016 the jury heard testimony from Jones, Onopa, and York; listened to Onopa's recording; and heard expert testimony by a U.S. Cellular employee about Jones's cellphone records. As York did during his investigation, the jury heard contradictory stories from Onopa and Jones. After the two-day trial, the jury returned a guilty verdict.

The court sentenced Jones to seven years of probation and nine months in jail and ordered her to pay restitution. With the assistance of new counsel, Jones moved for postconviction relief, arguing that her trial counsel was ineffective, that the government failed to produce exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that new evidence created a reasonable probability of a different result at a new trial.

About six months later, in June 2018, the trial judge held a hearing on the motion.[2] He expressed concern about Jones's trial counsel's failure to seek suppression of Onopa's

---

[2] "In Wisconsin's postconviction process, an offender's initial step in challenging a sentence is a postconviction motion filed under WIS. STAT. § 974.02, which allows the trial court the first opportunity to consider certain challenges." *Minnick v. Winkleski*, 15 F.4th 460, 465 n.2 (7th Cir. 2021).

recording on the basis that it was "made for the purpose of extortion." If it was, he reasoned, it would be an "unlawful recording," and "it would be inadmissible."[3] The trial judge reiterated this concern at a hearing in July. In October, the district attorney, in an unusual move, conceded Jones's motion for postconviction relief. Rather than seek a retrial, the prosecutor requested that all charges against Jones be dismissed, which the court granted. Jones was incarcerated after her conviction, though the record does not say for how long.

## II

After the State dropped the charges, Jones sued York, Adams County, and "as-of-yet unknown employees of the Adams County Sheriff's Department" under 42 U.S.C. § 1983. Under the Fourteenth Amendment, Jones alleged York "withheld exculpatory evidence," "fabricated false reports," and "lied in his trial testimony contributing to Jones' conviction." In addition, Jones tersely referenced a Fourth Amendment violation. On appeal, she explains, "when York signed the criminal complaint, he violated [her] clearly established Fourth Amendment constitutional right to be free from legal process without probable cause." She also brought various state-law claims against the defendants.

---

[3] For purposes of recording oral communication, Wisconsin is generally a one-party consent state, but not when "the communication is intercepted for the purpose of committing any criminal or tortious act." *See* WIS. STAT. § 968.31(2)(c). Criminal extortion (a felony offense) occurs when a person "verbally or by any written or printed communication, maliciously threatens to accuse or accuses another of any crime or offense … with intent thereby to extort money or any pecuniary advantage." *Id*. § 943.30(1).

The district court granted the defendants' motion for summary judgment, ruling that Jones failed to articulate a constitutional violation that could support her § 1983 claim—though it characterized the behavior of York, Jones's trial counsel, and the Adams County prosecutors as "deeply troubling." Specifically, the court held that York did not commit a *Brady* violation or fabricate evidence, York was covered by absolute immunity for his trial testimony, and Jones did not have a cognizable Fourth Amendment claim because she was not detained before trial and there was no "free-standing constitutional tort of malicious prosecution."

Because the district court concluded that Jones failed to articulate a cognizable constitutional claim against any individual defendant, it summarily dismissed her *Monell* claim against Adams County. The district court also dismissed the "as-of-yet unknown employees of Adams County Sheriff's Department" because Jones failed to update this placeholder after discovery. Finally, the district court declined to exercise supplemental jurisdiction over the state-law claims and dismissed them without prejudice. Jones now appeals.

### III

Jones does not challenge the district court's dismissal of the unknown county employees, so she has forfeited the ability to do so now. *Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019). As to the remaining two defendants, we agree with the district court: if York did not violate Jones's constitutional rights, then Adams County is not liable under *Monell* because she did not suffer a constitutional injury attributable to any county custom or policy. *See Petty v. City of Chicago*, 754 F.3d 416, 424–25 (7th Cir. 2014); *Alexander v. City of S. Bend*, 433 F.3d 550, 557 (7th Cir. 2006).

Our focus, then, is on York. Jones argues he violated the Constitution in four ways, but the district court granted summary judgment to York across the board. We review these decisions de novo, construing the record in the light most favorable to Jones. *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021).

## A

First is Jones's assertion that York withheld exculpatory evidence, destroyed exculpatory evidence, or did both. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Arizona v. Youngblood*, 488 U.S. 51 (1988). Jones identifies two pieces of withheld evidence: (1) the meaning of certain information in her cellphone records and (2) the missing March 21 recording.[4] On the latter, she argues alternatively that York destroyed it. We analyze claims of withheld evidence and destroyed evidence under slightly different standards.

### 1

Under *Brady v. Maryland*, law enforcement officers "must turn over potentially exculpatory evidence when they turn over investigative files to the prosecution." *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). "[T]he *Brady* doctrine applies equally to both exculpatory and impeachment evidence." *Canen v. Chapman*, 847 F.3d 407, 412 (7th Cir. 2017). To prevail

---

[4] Before the district court, Jones also alleged that two other pieces of evidence were unlawfully withheld: Onopa's recording allegedly containing Jones's confession, and Officer Bornbach's police report documenting his interactions with Jones after she contacted him on March 4, 2013. The district court rejected both arguments, finding that neither was withheld. Onopa's recording was played at trial, and Bornbach's report was publicly accessible. Jones does not appeal those rulings.

on a *Brady* claim against an officer, a plaintiff must show that "(1) the evidence is favorable to him; (2) the evidence was concealed by the officer; and (3) the concealed evidence resulted in prejudice." *Cairel v. Alderden*, 821 F.3d 823, 832 (7th Cir. 2016) (citing *Harris*, 486 F.3d at 1014). Concealed evidence is prejudicial—or material—if "there is 'a reasonable probability' that the outcome would have been different if the evidence had been disclosed." *United States v. King*, 910 F.3d 320, 327 (7th Cir. 2018).

As to evidence destruction, under *Arizona v. Youngblood*, a law enforcement officer violates a defendant's due process rights if he "fail[s] to preserve potentially useful evidence" and does so in bad faith. 488 U.S. at 58. To prove a *Youngblood* violation, a defendant must show that "(1) the [law enforcement officer] acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the [defendant] was unable to obtain comparable evidence by other reasonably available means." *McCarthy v. Pollard*, 656 F.3d 478, 485 (7th Cir. 2011). While both *Brady* and *Youngblood* protect exculpatory evidence, *Youngblood* focuses on its preservation, whereas *Brady* focuses on its delivery.

**2**

Jones argues that York "committed a *Brady* violation because he never provided the proprietary cell phone Switch data information to the state or to Jones—exculpatory evidence that proves she was never in Arlington Height[s], Illinois confessing to arson after the fire." She refers to a column in the cellphone data York retrieved from U.S. Cellular labeled "switch." Two entries appear in that column: "madi"

and "appl" (for Madison and Appleton, Wisconsin, respectively).[5]

As the district court noted, Jones's cell phone records were "presented and discussed by both sides at trial," so they cannot form the basis for a *Brady* challenge. In her opening brief, Jones concedes that "both York and [a U.S. Cellular employee] testified about Jones' cell phone records." But she clarifies that the "*meaning* of the Switch column" was not provided to her. Her claim, then, is that her trial counsel failed to elicit testimony about the phone records, not that York withheld exculpatory evidence—a predicate to a *Brady* violation.

Jones resists this conclusion with a citation to *Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001). But *Boss* does not support her claim. There, the court held that withholding a witness statement containing exculpatory information was a *Brady* violation, even though the defense had earlier access to the witness. *Id.* at 740, 744. The witness learned new information after interviewing with the defense—thus, the information was not reasonably available to defense counsel. *Id.* Here, the phone records did not change between the time they were handed over to the defense and the time they were discussed at trial.

Jones's argument is incorrect for a second reason. Cell-phone records in hand, it was the defense's responsibility to understand, interpret, and use the records at trial. The column of data at issue contained four-letter identifiers representing the switch used to route the call, including "madi" for Madison and "appl" for Appleton. Jones did not need an expert's

---

[5] There is only one other Wisconsin-based switch, New Berlin ("newb"), though it does not appear in Jones's records.

insight to understand what this column meant. Unlike in *Boss*, a reasonably diligent attorney would seek to understand the import of the "switch" column and question the U.S. Cellular employee about it at trial. York did not violate *Brady* by not informing Jones or the district attorney what the U.S. Cellular employee told him about the switch column.

**3**

Although less than clear, Jones appears to reraise her claim that York violated her due process rights by destroying or withholding the missing March 21 recording of the phone call between Jones and Onopa. The district court held that the Adams County Circuit Court's pretrial motion-to-dismiss ruling collaterally estopped Jones from making this argument. We agree with Jones that the district court erroneously applied the doctrine of collateral estoppel.

Collateral estoppel "bars the relitigation, in subsequent proceedings between the same parties, of specific issues heard and decided in their previous suit." *Amcast Indus. Corp. v. Detrex Corp.*, 45 F.3d 155, 158 (7th Cir. 1995). This doctrine applies to § 1983 plaintiffs who attempt to relitigate issues adjudicated in state court. *Allen v. McCurry*, 449 U.S. 90, 104 (1980). In this scenario, we "apply the preclusion (res judicata and collateral estoppel) principles of the state whose judgment is sought to be used to block relitigation." *Saecker v. Thorie*, 234 F.3d 1010, 1014 (7th Cir. 2000).

In Wisconsin, collateral estoppel must rest on a valid prior judgment. *In re Est. of Rille ex rel. Rille*, 728 N.W.2d 693, 702 (Wis. 2007). The wrinkle in this case is that the underlying judgment of conviction, which encompasses the court's

pretrial rulings,[6] was vacated by a grant of postconviction relief. Although our research did not reveal a Wisconsin decision resolving whether a vacated judgment qualifies as a valid prior judgment, we have previously observed the general principle that "[a] vacated judgment is not a permissible basis for collateral estoppel." *Korczak v. Sedeman*, 427 F.3d 419, 422 (7th Cir. 2005) (Illinois law); *see also Pontarelli Limousine, Inc. v. City of Chicago*, 929 F.2d 339, 340 (7th Cir. 1991) ("A vacated judgment has no collateral estoppel … effect under Illinois law (or any other law).") (citations omitted); *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019) (Michigan law); *No E.-W. Highway Comm., Inc. v. Chandler*, 767 F.2d 21, 24 (1st Cir. 1985) ("A vacated judgment has no preclusive force either as a matter of collateral or direct estoppel or as a matter of the law of the case."); *Brisco v. Stinar*, No. 19-CV-7233, 2020 WL 7027719, at *8 (N.D. Ill. Nov. 30, 2020) (collecting cases and stating that "federal appellate courts around the country recognize that a vacated judgment has no preclusive effect for purposes of collateral estoppel."); 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4432 (3d ed.) ("There is no preclusion as to the matters vacated or reversed.").

We see no reason why Wisconsin would depart from this established rule. Adhering to a vacated judgment would circumvent collateral estoppel's finality element by giving force to a void ruling. Here, the Wisconsin trial court's pretrial ruling about whether the missing March 21 recording contained apparently or potentially exculpatory evidence merged with

---

[6] *See State v. Rabe*, 291 N.W.2d 809, 815 n.5 (Wis. 1980) (recognizing the principle that prejudgment orders merge with the final judgment of conviction).

the now-vacated final judgment, so it does not have a preclusive effect.[7]

While we agree with Jones that the district court erroneously applied collateral estoppel, her claims still must be dismissed. Jones contends York either destroyed the March 21 recording (a *Youngblood* violation) or withheld it (a *Brady* violation). She does not prevail under either theory.

Although we view the facts in the light most favorable to Jones, her first hurdle is to persuade us that the recording existed in the first place. At the pretrial motion-to-dismiss hearing, the court asked York whether he "attempt[ed] to record" the conversation between Jones and Onopa. He replied, "I did." York explained that he was not sure which device he would have used because he had four at the time. During cross-examination at trial, Jones's counsel asked York, "So you're saying your intention was to record it but ultimately it appears it wasn't recorded there was some malfunction?" York responded, "Correct." If no recording was ever made, York could not have withheld or destroyed it.

Assuming a recording was made, Jones faces other obstacles. There is significant agreement between the parties about the contents of the recorded phone call. Both sides agree Onopa sought $3,500 in exchange for the recording he made, though they disagree about his motive for making that offer.

---

[7] This conclusion is consistent with *Heck v. Humphrey*, 512 U.S. 477 (1994), which held that a § 1983 plaintiff "must prove that [her] conviction or sentence has been … reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." *Heck*, 512 U.S. at 486–87, 489. If Jones's state-court conviction remained active, *Heck* suggests that 28 U.S.C. § 2254, not 42 U.S.C. § 1983, would be her only remedy—an odd result because she is no longer incarcerated.

Onopa testified he wanted $3,500 as compensation for personal property lost in the fire. York testified that Onopa did not mention any property on the arranged call but did say he mentioned an "agreement" he had with Jones. And Jones characterized Onopa's demand as pure extortion.

Even if we accept Jones's recitation of what transpired, there was no *Brady* violation. Jones must demonstrate that the recorded phone call contained favorable evidence, which can be exculpatory or impeaching. At the outset, the phone call was not exculpatory. Whether Onopa wanted the money out of greed or to compensate himself for lost items has no bearing on Jones's culpability. Each motivation is consistent with the prosecution's theory that Jones plotted to burn down her house for insurance money. But we agree with Jones that the phone call could be used to impeach York or Onopa if their versions of the phone call differed from the recorded version. This satisfies *Brady*'s "favorable evidence" element.

What dooms Jones's *Brady* claim is materiality. The jury heard in-person testimony from York, Jones, and Onopa about the events leading up to and following the fire. Questioning by the prosecution and the defense exposed the discrepancies in each witness's version of events. Thus, there is not "'a reasonable probability' that the outcome would have been different if the evidence had been disclosed." *King*, 910 F.3d at 327. "[O]rdinarily, newly discovered impeachment evidence will not warrant a new trial under *Brady*" because it is "often cumulative of other impeachment evidence presented at trial." *United States v. Salem*, 578 F.3d 682, 688 (7th Cir. 2009). One exception is "where the government's case rests entirely on one witness's testimony and credibility." *United States v. Brown*, 865 F.3d 566, 574 (7th Cir. 2017). But that is not the case

here. The State called seven witnesses, including York, On-opa, Jones's insurance agent, and the electrician contacted by Jones. The State also called an expert witness to explain the meaning of Jones's cellphone records. All this informed the jury's verdict. Jones's case therefore does not fall into the exception for particularly important impeachment evidence, and her *Brady* claim fails.

Jones cannot prevail under *Youngblood*, either. To do so, she must show that "potentially" exculpatory evidence was destroyed and that the exculpatory value of the evidence was "apparent." *McCarthy*, 656 F.3d at 485. We have already established that the missing March 21 recording was not exculpatory. Jones also must show that York acted in bad faith—that he made a "conscious effort to suppress [the recording]." *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000) (internal quotation marks omitted). Jones submitted no evidence of bad faith. To the contrary, York's testimony about the missing March 21 recording has been consistent: he thought he recorded the phone call, but he could not find it when he looked for it. At most, he was negligent in using a recorder or in managing his files, but "mere negligence by police does not amount to a constitutional violation." *United States v. Holly*, 940 F.3d 995, 1002 (7th Cir. 2019).

We sum up our analysis of Jones's claim about the recording, assuming it ever existed, as follows. If Jones's theory is that York withheld the recording, her claim fails because it was not material impeachment evidence. And if her theory is that York destroyed the recording, her claim fails because the recording was not exculpatory and she failed to offer evidence of bad faith.

**B**

Next, Jones argues York violated her due process rights by fabricating evidence. "[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). The district court ruled that Jones had "identified no such evidence." On appeal, Jones points to three aspects of York's investigative reports that she believes were falsified:

- York's recollection of his March 21 interview with Jones;

- York's description of the arranged March 21 call between Onopa and Jones; and

- York's discussion of Jones's cell phone records.

Starting with the March 21 interview, Jones alleges an omission and an error. York's report did not inform the district attorney about Jones's allegation that Onopa put his hands on her throat. York's report also stated that Jones reported a theft to the Marshfield Police. The district court correctly determined that these anomalies did not constitute falsifications because the "hallmark of a fabrication case" is that the officer "created evidence that [he] knew to be false." *Petty*, 754 F.3d at 423.

During their interview, Jones told York that she reported Onopa's "behavior" to the Marshfield Police. Later in the interview, she mentioned that Onopa took some of her belongings. In distilling the conversation post-interview, York reasonably inferred that Jones had reported Onopa for theft.

To be sure, Jones also told York that Onopa "had [her] by the throat," and York did not relay this information in his report. But his report was a summary, directing the reader to a recording of the full conversation. York was recapitulating the conversation rather than transcribing it. That his report was not a comprehensive recitation of his dialogue with Jones does not make it a false account.

As to the arranged March 21 phone call between Jones and Onopa, Jones disputes York's recollection of the conversation. She tries to leverage York's statements to Bornbach on March 28, when York characterized Onopa's statements as "extortion." But Jones does not explain why York's actual police report is inconsistent with his statements to Bornbach. While York did not use the term "extort" in his report, he described the recorded conversation in detail, relaying Onopa's offer to hand over an allegedly incriminating recording in exchange for $3,500. What he described is consistent with the term "extortion."

Finally, Jones targets Onopa's recording, claiming "York's report regarding the alleged confession—that he was sure the female voice was Jones, that he could hear she admitted to burning her house—is misleading because the female voice is inaudible at best." But, as the district court recognized, York's report admitted that "background noises … made it difficult at times to clearly hear the voices." So, York honestly stated that his impression was not certain. Jones also faces a causation issue because the jury listened to the recording and necessarily made its own determination about the identity of the voices and the content of their words. The plaintiff must show that the fabrication of evidence caused a deprivation of

liberty. *See Whitlock*, 682 F.3d at 582. Jones cannot meet this burden, and the district court properly rejected her claim.

## C

Jones also claims that York falsely testified at trial about his March 21, 2013 police report, Jones's cellphone records, and the missing March 21 recording. But under *Briscoe v. La-Hue*, 460 U.S. 325 (1983), York is absolutely immune from damages liability for his trial testimony. *Id.* at 326; *see also Canen*, 847 F.3d 407 at 415 ("It is long-established that witnesses enjoy absolute immunity."); *Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2015) (en banc) ("Witnesses in a § 1983 trial have absolute immunity from liability based on their testimony at trial."). "[T]his protection covers the preparation of testimony as well as its actual delivery in court." *Canen*, 847 F.3d at 415.

Jones attempts to circumvent *Briscoe* by citing this court's decision in *Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017). She misunderstands *Avery*. There, this court clarified that police officers who fabricate evidence cannot immunize themselves by authenticating it at trial. *Avery*, 847 F.3d at 441. In other words, police officers cannot purify fabricated evidence by invoking *Briscoe*'s absolute-immunity rule. *Id.* As discussed above, although we view the facts in the light most favorable to her, Jones failed to show a genuine dispute of fact as to whether York fabricated evidence. That ends the matter.

## D

Finally, Jones argues she was wrongfully detained in violation of the Fourth Amendment. In *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), the Supreme Court clarified that "detention without probable cause violates the Fourth Amendment

'when it precedes, but also when it follows, the start of legal process in a criminal case.'" *Lewis v. City of Chicago*, 914 F.3d 472, 474 (7th Cir. 2019) (quoting *Manuel*, 137 S. Ct. at 918). But "once a trial has occurred, the Fourth Amendment drops out: A person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment." *Manuel*, 137 S. Ct. at 920 n.8; *see also Kuri v. City of Chicago*, 990 F.3d 573, 575 (7th Cir. 2021) ("*Manuel* held that the Fourth Amendment supplies the basis for a [wrongful-detention] claim until the suspect is either convicted or acquitted."). Jones admits she was not incarcerated until after her conviction. Thus, the Fourth Amendment does not provide a remedy for her incarceration.[8]

\*          \*          \*

Although Jones was eventually exonerated on the charge of arson, there is no civil liability for how she was investigated and prosecuted. For the reasons above, we AFFIRM the district court's grant of summary judgment to the defendants.

---

[8] Jones would fare no better under a Fourth Amendment malicious prosecution theory, *see Thompson v. Clark*, 142 S. Ct. 1332 (2022), because she would have "to prove that the malicious prosecution resulted in a seizure." *Id.* at 1337 n.2. As explained above, Jones was not seized until after her conviction, at which point her claim arises under the Due Process Clause of the Fourteenth Amendment, not the Fourth Amendment. *Manuel*, 137 S. Ct. at 920 n.8. Whether the Fourteenth Amendment's procedural due process component ensures a right to be free from malicious prosecution is an open question. *Thompson*, 142 S. Ct. at 1337 n.2. But Jones did not raise such a claim, and the availability of post-deprivation remedies in Wisconsin likely precludes any § 1983 relief under that theory. *See Albright v. Oliver*, 510 U.S. 266, 285–86 (1994) (Kennedy, J., concurring).